THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. JOSEPH LOCHNER, Appellant.

CONSTITUTIONAL LAW — PROVISION OF LABOR LAW RESTRICTING HOURS OF LABOR IN BAKERIES CONSTITUTIONAL. Section 110 of article 8 of the Labor Law (L. 1897, ch. 415), providing that "No employe shall be required or permitted to work in a biscuit, bread or cake bakery.or confectionery establishment more than sixty hours in any one week, or more than ten hours in any one day, unless for the purpose of making a shorter work day on the last day of the week; nor more hours in any one week than will make an average of ten hours per day for the number of days during such week in which such employe shall work," is an exercise of the police power of the legislature relating to the public health, and therefore violates no provision of the State or Federal Constitutions.

*People* v. *Lochner*, 73 App. Div. 120, affirmed.

(Argued October 16, 1903; decided January 12, 1904.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered October 8, 1902, which affirmed a judgment of the Oneida County Court convicting of a misdemeanor.

The facts, so far as material, are stated in the opinion.

*William S. Mackie* and *Smith M. Lindsley* for appellant. The demurrer should have been sustained upon the first and

second grounds, that more than one crime is charged in a single count. (Code Crim. Pro. §§ 278, 279; Penal Code, § 384l; *People* v. *McCarthy*, 110 N. Y. 314; *People* v. *Upton*, 38 Hun, 107; *People* v. *Tower*, 135 N. Y. 459; *People* v. *Cole*, 2 N. Y. Cr. Rep. 110; *People* v. *Stock*, 21 Misc. Rep. 147; *People* v. *Sebring*, 14 Misc. Rep. 31; *People* v. *Hartwell*, 166 N. Y. 366.) The demurrer should have been sustained upon the ground that the facts stated do not constitute a crime. (U. S. Const. art. 14; § 1; N. Y. Const. art. 1, § 6; *Taylor* v. *Porter*, 4 Hill; 140; *White* v. *White*, 5 Barb. 474; *People* v. *Toynbee*, 20 Barb. 198; *Wynehamer* v. *People*, 13 N. Y. 378; *People* v. *Warren*, 77 Hun, 120; *People ex rel.* v. *Beck*, 144 N. Y. 227; *People ex rel.* v. *Coler*, 166 N. Y. 1.) Section 110 of article 8 of the Labor Law is void for the reason that it interferes with the freedom of individuals to enter into a contract with one another. (*People* v. *O. C. R. C. Co.*, 175 N. Y. 84; *People* v. *Budd*, 117 N. Y. 15; *Matter of Jacobs*, 98 N. Y. 98; *People* v. *Hawkins*, 157 N. Y. 1; *People ex rel.* v. *Coler*, 166 N. Y. 14; *Powers* v. *Shepard*, 30 How. Pr. 8; *Leep* v. *St. L. Ry. Co.*, 58 Ark. 407; *Ex parte Kubach*, 85 Cal. 274; *State* v. *Norton*, 7 Ohio Dec. 354; 5 Ohio N. P. 183; *Ritchie* v. *People*, 155 Ill. 98; *Godcharles* v. *Wigeman*, 113 Penn. St. 431; *State* v. *Goodwill*, 33 W. Va. 179; *State* v. *F. C. Co.*, 33 W. Va. 188; *State* v. *Loomis*, 115 Mo. 307.) Section 110 of article 8 of the Labor Law cannot be upheld as a proper exercise of the police power under a claim that it is a health measure. It does not by its terms pretend to refer to the matter of health at all, and there is no reasonable connection with it and the public health. (*Matter of Jacobs*, 98 N. Y. 110; *People* v. *Gilson*, 109 N. Y. 401; *Ritchie* v. *People*, 155 Ill. 98; *Colon* v. *Lisk*, 153 N. Y. 188.) The Labor Law attempts to fix the hours which shall be regarded as a day's work and allows extra hours to be worked for extra compensation in all trades and callings, except bakers. Thereby bakers are unjustly discriminated against, and section 110 of said law does not extend to them the same rights and privileges enjoyed by

others. (*Matter of Eight-Hour Law*, 21 Col. 14; *Low* v. *Rees Pub. Co.*, 41 Neb. 127; *State* v. *Goodwill*, 33 W. Va. 179.) There is an unjust and illegal discrimination because special privileges are conferred upon individual bakers. (*People* v. *Havnor*, 149 N. Y.195.)

*Timothy Curtin* for respondent. The indictment herein is sustainable. (*People* v. *West*, 106 N. Y. 293, 295; *People* v. *King*, 110 N. Y. 422; *People* v. *Weldon*, 111 N. Y. 574; *People* v. *O'Malley*, 52 App. Div. 46–49; *People* v. *Burns*, 53 Hun, 274.) The law in question was enacted to protect the health and safety of the public, by regulating the sanitary condition of the bakery and confectionery establishments of the state and it comes within the police regulation of the state. (*H. T. Church* v. *United States*, 143 U. S. 457; *People ex rel.* v. *Sturgis*, 78 App. Div. 643; *People* v. *West*, 106 N. Y. 293; *Munn* v. *Illinois*, 94 U. S. 113; *People* v. *Budd*, 117 N. Y. 14; *People* v. *Ever*, 141 N. Y. 132; *Bertholf* v. *O'Reilly*, 74 N. Y. 523; *People* v. *Rosenberg*, 138 N. Y. 415; *Health Dept.* v. *Rector, etc.*, 145 N. Y. 42.) The state has the right to regulate the hours of labor that an employee shall perform in one day and one week in a business that is dangerous or unhealthy. (*People* v. *Havnor*, 149 N. Y. 201; *People ex rel.* v. *Warden, etc.*, 144 N. Y. 535; *Holden* v. *Hardy*, 169 U. S. 381; *People* v. *O. C. R. C. Co.*, 175 N. Y. 87; *People ex rel.* v. *Coler*, 166 N. Y. 25.) The law in question affects alike all persons similarly situate, and none are, therefore, unjustly discriminated against. (*People* v. *Havnor*, 149 N. Y. 205.)

Parker, Ch. J. Defendant's conviction is under subdivision 3, section 384*l*, Penal Code, which makes a violation of article VIII, chapter 415, Laws 1897, a misdemeanor. The judgment is affirmed by the Appellate Division.

Defendant urges as ground for a reversal that article VIII — which on its face purports to be, as we shall see later, an exercise of the police power of the state — offends against the

first section of the 14th amendment to the United States Con-
stitution. That section provides that "No state shall make or
enforce any law which shall abridge the privileges or immuni-
ties of citizens of the United States; nor shall any state
deprive any person of life, liberty or property, without due
process of law, nor deny to any person within its jurisdiction
the equal protection of the laws." It is also claimed that the
statute violates those provisions of the State Constitution
which declare that "No member of this state shall be dis-
franchised, or deprived of any of the rights or privileges
secured to any citizen thereof, unless by the law of the land,
or the judgment of his peers" (Const. art. 1, § 1), "nor be
deprived of life, liberty or property without due process of
law." (Const. art. 1, § 6.)

The first cases in which the 14th amendment is discussed
by the United States Supreme Court are the *Slaughter House
Cases* (83 U. S. 36), wherein is challenged the Louisiana stat-
ute authorizing the removal of noxious slaughter houses from
the more densely populated part of New Orleans, and their
location where they could least affect the health and comfort
of the people, and to that end granting a corporation exclusive
right for 25 years to maintain slaughter houses within 3 par-
ishes, containing between 200,000 and 300,000 people, and
including New Orleans. This is held to be a police regulation
for the health and comfort of the people, and, therefore,
within the power of the state legislature, and not affected by
the 14th amendment, which the court says is not intended to
interfere with the exercise of police power by the states.

In *Barbier* v. *Connolly* (113 U. S. 27) the Supreme Court
has before it a San Francisco ordinance prohibiting work in
public laundries within defined territory from 10 P. M. to 6
A. M., claimed to be repugnant to the 14th amendment. The
court rules that the ordinance is well within the police power,
and in the course of the opinion says: "Neither the amend-
ment — broad and comprehensive as it is — nor any other
amendment, was designed to interfere with the power of the
state, sometimes termed its police power, to prescribe regula-

tions to promote the health, peace, morals, education and good
order of the people, and to legislate so as to increase the indus-
tries of the state, develop its resources and add to its wealth
and prosperity."   (p. 31.)

There are many interesting cases in the United States
Supreme Court sustaining statutes of different states which in
terms seem repugnant to the 14th amendment, but which that
court declares to be within the police power of the states.
Among them are statutes declaring a railroad company liable
for damages to an employee although caused by another
employee (127 U. S. 205); fixing the damages at double the
value of stock killed, when due to the neglect of a railroad
company to maintain fences (129 U. S. 26); requiring loco-
motive engineers to be licensed, and providing that the rail-
road company employing them pay the fees of examination
(128 U. S. 96); requiring cars to be heated otherwise than by
stoves on railroads over 50 miles in length (165 U. S. 628);
providing for immediate payment of wages by railroad com-
panies to discharged employees (173 U. S. 404); prohibiting
options to sell grain (184 U. S. 425); providing for inspection
of mines at expense of owners (185 U. S. 203), and one
declaring void all contracts for sales of stocks on margins (187
U. S. 606).

I shall call special attention to but one other case, namely,
*Holden* v. *Hardy* (169 U. S. 366).   In that case the court
reviews at length many of the cases arising under the 14th
amendment, beginning with the *Slaughter House* cases.
The case involves a Utah statute providing that "The period
of employment of workingmen in all underground mines or
workings shall be eight hours per day, except in cases of
emergency where life or property is in imminent danger."
Violation is made a misdemeanor.   The conviction of one
Holden under that statute is affirmed by the United States
Supreme Court.   It is argued by defendant in that case that
the statute has no relation to the health or safety of the pub·
lic or the persons affected, or if so, only in a very remote
degree, while its direct and principal effect is to interfere

with the rights and liberties of the contracting parties; that the right to contract contains three essential and indispensable elements, guaranteed and protected by the United States Constitution, namely, "the right of the employer and employee to agree upon (1) the character of the service to be performed, (2) the amount to be paid for such service, and (3) the number of hours per day during which the service is to continue;" that the destruction or abridgment of one element is a destruction or abridgment of the whole of said right to contract; that the statute abridges the "privileges and immunities" in that it deprives the employer and the employee of perfect freedom and liberty to pursue unmolested a lawful vocation in a lawful manner; that the rights of the employer and employee in that direction were unlimited before the adoption of the 14th amendment and that since its adoption it is beyond the power of any state to make any laws abridging or destroying such rights. This latter contention — which if sustained would practically prevent all further development of the police power on the part of the states — is overborne by the court. Many cases passed upon by the court since the adoption of the 14th amendment are cited furnishing illustrations tending to justify the boast of the devotees of the common law, that by the application of established legal principles the law has been, and will continue to be developed from time to time so as to meet the ever-changing conditions of our widely diversified and rapidly developing business interests. The court quotes from Mr. Justice MATTHEWS in *Hurtado* v. *California* (110 U. S. 516, 530): "This flexibility and capacity for growth and adaptation is the peculiar boast and excellence of the common law. * * * The Constitution of the United States was ordained, it is true, by descendants of Englishmen, who inherited the traditions of English law and history; but it was made for an undefined and expanding future, and for a people gathered and to be gathered from many nations and of many tongues. * * * There is nothing in Magna Charta, rightly construed as a broad charter of public right and law, which ought to exclude the best ideas of all systems

and of every age; and as it was the characteristic principle of the common law to draw its inspiration from every fountain of justice, we are not to assume that the sources of its supply have been exhausted. On the contrary, we shall expect that the new and various experiences of our own situation and system will mould and shape it into new and not less useful forms." The court illustrates by forceful examples the necessity of recognizing in legal decisions the change of conditions. After calling attention to the fact that in the early history of the country there was no occasion for any special protection of a particular class, as we were almost purely an agricultural country, it instances coal mining and the manufacture of iron. When these industries began in Pennsylvania as early as 1716 they were carried on in such a limited way, and by such primitive methods, that no special laws were deemed necessary to protect operatives; but since that time they have assumed such vast proportions in that and other states, and developed so many dangers to the safety and life of those engaged in them, that laws to meet such exigencies have become necessary. It calls attention to many protective statutes enacted in many different states providing for fire escapes in hotels, theatres, factories and other large buildings; inspection of boilers; appliances to obviate the dangers incident to railroad and steamboat transportation; the protection of dangerous machinery against accidental contact; the shoring up of ventilation shafts; means for signaling in mines for fresh air; the elimination as far as possible of dangerous gases, and safe means of hoisting and lowering employees in mines. It is said that statutes providing such safeguards " have been repeatedly enforced by the courts of the several states; their validity assumed, and, so far as we are informed, they have been uniformly held to be constitutional" (169 U. S. 366, 394), which, of course, means that the courts of the several states making these decisions hold that such statutes do not deprive citizens of any of the rights or privileges guaranteed by the Constitution, nor deprive them of property without due process of law, for every State Constitution con-

tains such a provision or its equivalent. Of such illustrations the court further says (p. 387): " They are mentioned only for the purpose of calling attention to the probability that other changes of no less importance may be made in the future, and that while the cardinal principles of justice are immutable, the methods by which justice is administered are subject to constant fluctuation, and that the Constitution of the United States, which is necessarily and to a large extent inflexible and exceedingly difficult of amendment, should not be so construed as to deprive the states of the power to so amend their laws as to make them conform to the wishes of the citizens as they may deem best for the public welfare without bringing them into conflict with the supreme law of the land." This broad-minded view — which is characteristic of the development of the law by this great court since the adoption of the 14th amendment — should, and doubtless will be followed by the courts of the several states whenever called upon to determine whether statutes offend against the provisions of State Constitutions similar or equivalent to the provisions of the 14th amendment. The cases cited, and the reasoning of the court, to which but brief reference is here made, demonstrate that this statute does not offend against the 14th amendment, and it necessarily follows that it is not repugnant to equivalent provisions in our State Constitution.

This court throughout all its history has maintained the same position as that taken by the United States Supreme Court. Many authorities could be cited in support of that assertion, but none need be for they are all in one direction.

The impossibility of setting the bounds of the police power has up to this time prevented any court from attempting it, and the reason for it is well stated by Judge GRAY in *People* v. *Ewer* (141 N. Y. 129, 132). He says: " It is difficult, if not impossible, to define the police power of a state ; or, under recent judicial decisions, to say where the constitutional boundaries limiting its exercise are to be fixed. It is a power essential to be conceded to the state in the interest and for the welfare of its citizens. We may say of it that when its

operation is in the direction of so regulating the use of private property, or of so restraining personal action, as manifestly to secure, or to tend to the comfort, prosperity, or protection of the community, no constitutional guaranty is violated, and the legislative authority is not transcended." In that case the constitutionality of section 292, Penal Code, is questioned. That section makes it a misdemeanor to exhibit as a dancer a female child under 14 years of age. The court denies that the statute violates our Constitution because it deprives the mother, the person arrested, of the rights and privileges secured to her by the Constitution.

In *People ex rel. Nechamcus* v. *Warden, etc.* (144 N. Y. 529) the constitutionality of chapter 602, Laws 1892, is challenged. The act provides for examination and registration of master plumbers, and makes it a misdemeanor for any person to engage in that trade without such registration. This court holds the statute to be within the police power of the legislature, and, therefore, not repugnant to the Constitution. Judge Gray says in the opinion (p. 535): "There has been much discussion upon the subject of what is a valid exercise of the police power of the state through legislative enactment and there is little to be added to what this and other courts have said. The police power extends to the protection of persons and of property within the state. In order to secure that protection, they may be subjected to restraints and burdens by legislative acts. If the act is a valid and reasonable exercise of the police power of the state, then it must be submitted to, as a measure designed for the protection of the public and to secure it against some danger, *real or anticipated*, from a state of things which modifications in our social or commercial life have brought about. The natural right to life, liberty and the pursuit of happiness is not an absolute right. It must yield whenever the concession is demanded by the welfare, health or prosperity of the state. The individual must sacrifice his particular interest or desires if the sacrifice is a necessary one in order that organized society as a whole shall be benefited. That is a fundamental condition of the state, and which, in the

end, accomplishes by reaction a general good, from which the
individual must also benefit."

In *Health Department* v. *Rector, etc.* (145 N. Y. 32) the
court considers a provision of the New York Consolidation Act
requiring that tenement houses already erected shall be fur-
nished by the owners with water, " whenever they shall be
directed so to do by the board of health," " in sufficient quan-
tity at one or more places on each floor, occupied or intended
to be occupied by one or more families." The health depart-
ment served a notice requiring defendant to supply water, as
commanded by the statute, in buildings owned by it. Defend-
ant refused to do so, and an action was brought by the health
department to compel compliance. Defendant contends in
that case that the statute violates that provision of the State
Constitution which declares that no member of this state shall
" be deprived of life, liberty or property without due process
of law." This court holds that the statute does not offend
against the Constitution, but that it is a valid exercise of the
police power; that the legislature, by virtue of that power,
can direct that improvements or alterations shall be made in
existing houses at the owners' expense when it clearly appears
that it tends in some plain and appreciable manner to guard
and protect the public ; and that a compensation need not be
made to the owner in such case, the effect of the act being not
to appropriate private property, but simply to regulate its use
and enjoyment by the owner. Judge PECKHAM, writing the
opinion of the court, says (p. 43): " Laws and regulations of
a police nature, though they may disturb the enjoyment of
individual rights, are not unconstitutional, though no provision
is made for compensation for such disturbances. They do not
appropriate private property for public use, but simply regu-
late its use and enjoyment by the owner."

*People* v. *Havnor* (149 N. Y. 195) is a case as near the
border line perhaps as any to be found in this state — cer-
tainly very much nearer to it than the case 'under considera-
tion. It exhaustively considers the authorities in this state
bearing upon the police power. The case involves the consti-

tutionality of what is known as the Sunday Barber Law, which makes it a misdemeanor for any person to carry on the business or work of a barber on the first day of the week except in the city of New York and the village of Saratoga, where such business or work may be carried on until one o'clock in the afternoon of that day. The statute is held to be constitutional, because a valid exercise of the police power. The opinion is written by Judge VANN. After a careful examination of the authorities he presents the underlying question in this way (p. 201): "The vital question, therefore, is whether the real purpose of the statute under consideration has a reasonable connection with the public health, welfare or safety." After stating that the object of the act is to require the observance of Sunday, not as a holy day, but as a day of rest and recreation, he proceeds — with argument buttressed by authority in this state and in other jurisdictions — to answer the question in the affirmative. In the course of the argument he says (p. 203): "According to the common judgment of civilized men, public economy requires, for sanitary reasons, a day of general rest from labor, and the day naturally selected is that regarded as sacred by the greatest number of the citizens, as this causes the least inconvenience through interference with business. It is to the interest of the state to have strong, robust, healthy citizens, capable of self-support, of bearing arms, and of adding to the resources of the country. Laws to effect this purpose, by protecting the citizen from overwork and requiring a general day of rest to restore his strength and preserve his health, have an obvious connection with the public welfare. * * * The statute under discussion tends to effect this result, because it requires persons engaged in a kind of business that takes many hours each day, to refrain from carrying it on during one day in seven. This affords an opportunity, recurring at regular intervals, for rest, needed both by the employer and the employed, and the latter, at least, may not have the power to observe a day of rest without the aid of legislation. * * * As barbers generally work more hours each day than most men, the

legislature may well have concluded that legislation was necessary for the protection of their health."

The pertinency and controlling force of that argument to the question under consideration here will be manifest when we come to an examination of the statute.

No authorities can be found in this court which conflict with the cases to which I have called attention. *Rodgers' Case* (166 N. Y. 1) is cited in opposition, but why I cannot see. The police power is not even considered in that case. The defense to that portion of the statute which is condemned as unconstitutional because it requires a stipulation in all contracts with the state and municipalities that the contractor shall "pay the prevailing rate of wages at least," being rested on the ground (1) that the state as proprietor can do what an individual proprietor can do, namely, insist upon any reasonable provision in a contract as a condition for doing the work; (2) that the state is proprietor not only as to contracts for work for the benefit of the entire state, but also as to contracts for work authorized by it for the various subdivisions of the state made for convenience of administration; (3) that hence it violates no provision of the Constitution.

Having shown by an examination of a few of the leading authorities relating to the police power that the decisions of this court are in harmony with those of the United States Supreme Court, and having specially brought out some of the argument in those decisions for the purpose of presenting something of the vast scope of that power, we come next to the question, In what spirit should the court approach the consideration of a statute said on the one hand to offend against the Constitution, and on the other to be a proper exercise of the police power?

The courts are frequently confronted with the temptation to substitute their judgment for that of the legislature. A given statute, though plainly within the legislative power, seems so repugnant to a sound public policy as to strongly tempt the court to set aside the statute, instead of waiting, as the spirit of our institutions require, until the people can compel their representatives to repeal the obnoxious statute.

In the early history of this country eminent writers gave expression to the fear that the power of the courts to set aside the enactments of the representatives chosen to legislate for the people would in the end prove a weak point in our governmental system, because of the difficulty of keeping the exercise of such great power within its legitimate bounds. So far in our judicial history it must be said that the courts have in the main been conservative in passing upon legislation attacked as unconstitutional, but occasionally, and especially when a case is one on the border line, it is quite possible that the judgment of the court that the legislation is unwise may operate to carry the decision to the wrong side of that border line.    Certain it is that the courts have greatly extended their jurisdiction over many administrative acts that were originally supposed not to present cases for the court to pass upon, and in that way the courts have come to play a very important part in state and municipal administration.    Some expression of our views on that subject is given in *Matter of Guden* (171 N. Y. 529, 535).

Now when considering the mental attitude with which the court should begin an examination of this question, it is well to have in mind not only the great breadth and scope of the police power, and the legislative control over it as expressed in some of the opinions from which we quote *supra*, but it is also well to have in mind some of the expressions of this court as to the way in which the court should approach the consideration of such a question as this, involving the constitutionality of a statute.

Judge ANDREWS says, in *People* v. *King* (110 N. Y. 418, 423) : " By means of this power the legislature exercises a supervision over matters affecting the common weal.  *  *  * It may be exerted whenever necessary to secure the peace, good order, health, morals and general welfare of the community, and *the propriety of its exercise within constitutional limits is purely a matter of legislative discretion with which courts cannot interfere.*"

Judge GRAY says, in *Nechamcus' Case (supra)* : " The

courts should always assume that the legislature intended by its enactments to promote those ends [public health, comfort and safety], and if the act admits of two constructions, that should be given to it which sustains it and makes it applicable in futherance of the public interests." (144 N. Y. 529, 536.)

"Whether the legislation is wise is not for us to consider. The motives actuating and the inducements held out to the legislature are not the subject of inquiry by the courts, which are bound to assume that the law making body acted with a desire to promote the public good. Its enactments must stand, provided always that they do not contravene the Constitution, and the test of constitutionality is always one of power — nothing else. But in applying the test the courts must bear in mind that it is their duty to give the force of law to an act of the legislature whenever it can be fairly so construed and applied as to avoid conflict with the Constitution." (*Bohmer* v. *Haffen*, 161 N. Y. 390, 399.)

Where there "is room for two constructions, both equally obvious and reasonable, the court must, in deference to the legislature of the state, assume that it did not overlook the provisions of the Constitution, and designed the act   *   *   *   to take effect. Our duty, therefore, is to adopt the construction which, without doing violence to the fair meaning of the words used, brings the statute into harmony with the provisions of the Constitution." (*Supervisors* v. *Brodger*, 112 U. S. 261, 268 ; *People ex rel. Burrows* v. *Supervisors of Orange Co.*, 17 N. Y. 236, 241 ; *People ex rel. Bolton* v. *Albertson*, 55 N. Y. 50, 54 ; *Matter of Gilbert El. Ry. Co.*, 70 N. Y. 361, 367 ; *Matter of N. Y. & L. I. Bridge Co.* v. *Smith*, 148 N. Y. 540, 551.)

The court is inclined to so construe the statute as to validate it. (*People* v. *Equitable Trust Co.*, 96 N. Y. 387, 394 ; *People ex rel. Sinkler* v. *Terry*, 108 N. Y. 1, 7 ; *Matter of N. Y. El. R. R. Co.*, 70 N. Y. 327, 342 ; *People ex rel. Killeen* v. *Angle*, 109 N. Y. 564, 567 ; *Rogers* v. *Common Council of*

*Buffalo*, 123 N. Y. 173, 181 ; *People ex rel. Carter* v. *Rice*, 135 N. Y. 473, 484.)

"Every act of the legislature must be presumed to be in harmony with the fundamental law until the contrary is clearly made to appear." (*People ex rel. Kemmler* v. *Durston*, 119 N. Y. 569, 577.)

"Before an act of the legislature can be declared void as repugnant to the Constitution, the conflict must be manifest." (*Matter of Stilwell*, 139 N. Y. 337, 341.)

"If the act and the Constitution can be so construed as to enable both to stand, and each can be given a proper and legitimate office to perform, it is the duty of the court to adopt such construction." (*People* v. *Rosenberg*, 138 N. Y. 410, 415.)

The statute under consideration in that case is held to be within the police power, as is the statute considered in the following case.

"It is not necessary to the validity of a penal statute that the legislature should declare on the face of the statute the policy or purpose for which it was enacted." (*People* v. *West*, 106 N. Y. 293, 297.)

Having considered the authorities bearing upon the subject of the exercise of police power at greater length than could be justified were it not for the different view that obtains in this court as to the authority of the legislature to pass the statute in question, and having glanced at a few authorities indicating the frame of mind in which the court should approach the consideration of the question of the constitutionality of an act of the legislature — we come to the consideration of the statute in question, aided by the principles established by the United States Supreme Court and the courts of this state, to which reference has been made.

I quote the whole statute, notwithstanding its length, in order that it may be at once determined upon its mere reading whether the purpose of the legislature was to subserve, in some measure, the public good under the police power of the state.

## "ARTICLE VIII.

### "Bakeries and Confectionery Establishments.

"§ 110. *Hours of labor in bakeries and confectionery establishments.*— No employee shall be required or permitted to work in a biscuit, bread or cake bakery or confectionery establishment more than sixty hours in any one week, or more than ten hours in any one day, unless for the purpose of making a shorter work day on the last day of the week; nor more hours in any one week than will make an average of ten hours per day for the number of days during such week in which such employee shall work.

"§ 111. *Drainage and plumbing of buildings and rooms occupied by bakeries.*— All buildings or rooms occupied as biscuit, bread, pie or cake bakeries, shall be drained and plumbed in a manner conducive to the proper and healthful sanitary condition thereof, and shall be constructed with air shafts, windows or ventilating pipes, sufficient to insure ventilation. The factory inspector may direct the proper drainage, plumbing and ventilation of such rooms or buildings. No cellar or basement, not now used for a bakery shall hereafter be so occupied or used, unless the proprietor shall comply with the sanitary provisions of this article.

"§ 112. *Requirements as to rooms, furniture, utensils and manufactured products.*— Every room used for the manufacture of flour or meal food products shall be at least eight feet in height and shall have, if deemed necessary by the factory inspector, an impermeable floor constructed of cement, or of tiles laid in cement, or an additional flooring of wood properly saturated with linseed oil. The side walls of such rooms shall be plastered or wainscoted. The factory inspector may require the side walls and ceiling to be whitewashed, at least once in three months. He may also require the wood work of such walls to be painted. The furniture and utensils shall be so arranged as to be readily cleansed and not prevent the proper cleaning of any part of the room. The manufactured flour or meal food products shall be kept in dry and airy rooms so arranged that the floors, shelves and other facili-

ties for storing the same can be properly cleaned. No domestic animals, except cats, shall be allowed to remain in a room used as a biscuit, bread, pie, or cake bakery or any room in such bakery where flour or meal products are stored.

"§ 113. *Wash rooms and closets; sleeping places.*— Every such bakery shall be provided with a proper wash-room and water-closet or water-closets apart from the bake-room, or rooms where the manufacture of such food product is conducted, and no water-closet, earth-closet, privy or ashpit shall be within or connected directly with the bake-room of any bakery, hotel or public restaurant.

"No person shall sleep in a room occupied as a bake-room. Sleeping places for the persons employed in the bakery shall be separate from the rooms where flour or meal food products are manufactured or stored. If the sleeping places are on the the same floor where such products are manufactured, stored or sold, the factory inspector may inspect and order them put in a proper sanitary condition.

"§ 114. *Inspection of bakeries.*— The factory inspector shall cause all bakeries to be inspected. If it be found upon such inspection that the bakeries so inspected are constructed and conducted in compliance with the provisions of this chapter, the factory inspector shall issue a certificate to the persons owning or conducting such bakeries.

"§ 115. *Notice requiring alterations.*— If, in the opinion of the factory inspector, alterations are required in or upon premises occupied and used as bakeries, in order to comply with the provisions of this article, a written notice shall be served by him upon the owner, agent or lessee of such premises, either personally or by mail, requiring such alterations to be made within sixty days after such service, and such alterations shall be made accordingly."

That the public generally are interested in having bakers' and confectioners' establishments cleanly and wholesome in this day of appreciation of, and apprehension on account of, microbes, which cause disease and death, is beyond question. Not many years ago the baking was largely done in the

11

family ; but now in a large percentage of the houses in cities and villages the baker is relied on to a large extent to furnish bread, biscuits, cake and pie, as well as confectionery, while over many country roads the bakers' wagons go twice a week or more to supply the farmers and inhabitants of small settlements with their wares. Indeed it can be safely said that the family of to-day is more dependent upon the baker for the necessaries of life than upon any other source of supply. That being so it is within the police power of the legislature to so regulate the conduct of that business as to best promote and protect the health of the people. And to that end the legislature undertakes to provide — by a statute which bears on its face evidence of an intelligent draftsman acquainted with the dangers of unsanitary conditions in such establishments — for proper drainage and plumbing of the building and rooms occupied for such purpose.

Is there room to doubt that the sole purpose of the legislature in prohibiting the use of cellars for bakeries unless the occupant first complies with the sanitary provisions of this article is to protect the public from the use of the food made dangerous by the germs that thrive in darkness and uncleanness ? Is it possible that any one can question that the sole purpose of the legislature is the safeguarding of the public health when it provides for floors, ceilings and sidewalls of such material as that they may be readily cleansed ; compels the keeping of flour or meal food products in dry and airy rooms, so arranged that the storing facilities can be properly cleaned, and prohibits the keeping of domestic animals within such rooms ? And will any one question the motive which induced the prohibition of a " water-closet, earth-closet, privy or ashpit * * * within or connected directly with the bake-room of any bakery, hotel or public restaurant ? " If not, why should any one question the object of the legislature in providing in the same article and as a part of the scheme that " No employee shall be required or permitted to work " in such an establishment " more than sixty hours in any one week," an average of ten hours for each working day. It is

but reasonable to assume from this statute as a whole that the legislature had in mind that the health and cleanliness of the workers, as well as the cleanliness of the work-rooms, was of the utmost importance, and that a man is more likely to be careful and cleanly when well, and not overworked, than when exhausted by fatigue, which makes for careless and slovenly habits, and tends to dirt and disease.

If there is opportunity — and who can doubt it — for this view, then the legislature had the power to enact as it did, and the courts are bound to sustain its action as justified by the police power, as we see from the authorities referred to earlier in this opinion.

I hear but one argument advanced for the purpose of convincing the mind that the object of this statute is not to protect the public, and that argument is that article VIII is to be found in the Labor Law. Therefore, it is said it is a labor law, not a health law.

The question presented by that argument is, Does the label or the body of the statute prevail? Does calling a statute names deprive it of its intended and real character? If a statute relating principally to banking happens, in the course of codification, to be incorporated as an article in the General Corporation Law, does it cease to operate on the banking business? I submit without argument that the questions answer themselves.

Assuming, however, for the purpose of argument only, that the label is of such substantial importance that it may be accepted as against the obvious meaning of the statute, then I say that article VIII bears its own title, which is: "Bakeries and Confectionery Establishments." All that is contained in that article relates to bakeries and confectionery establishments and their conduct, and to no other subject whatever. Therefore, it is fully, appropriately and harmoniously entitled.

Again, inasmuch as it is obvious, as we have seen, from a mere reading of the statute, that the legislative purpose is to benefit the public, we must assume — even if the object of the legislature in limiting the hours of work of employees is not to

protect the health of the general public, who take the wares made by such employees — that the legislature intends to protect the health of the employees in such establishments; that, for some reason sufficient to it, it has reached the conclusion that in work of this character men ought not to be employed more than an average of ten hours a day. Now that being so — and certainly no more restricted view of that statute can be taken by those who would destroy it — we find that the action of the legislature is within the police power not only under the authorities of the United States, but of this state, and of this court.

Special attention has already been called to *Holden's Case* (169 U. S. 366). A Utah statute making it a misdemeanor to employ a man more than 8 hours per day in "underground mines or workings" is sustained, and a conviction thereunder upheld, by the United States Supreme Court, on the ground that it is within the police power of the state to pass such a statute. That interesting case — to which I have made extended reference *supra* — is in point and controlling so far as the 14th amendment is concerned, and should be controlling in this court so far as equivalent provisions of our State Constitution are concerned.

It must also be held, under the authority of *Havnor's Case* (*supra*) — even though it may be assumed from the reading of the statute that the object of the legislature is to protect employees in such establishments from working more than ten hours a day — that it is within the police power, and, therefore, not repugnant to the State Constitution. The statute which that case passes upon makes it a misdemeanor to carry on the business of a barber on the first day of the week, and a judgment of conviction under that law is affirmed in this court because "The statute under consideration has a reasonable connection with the public health, welfare or safety." Certainly if this court could so hold in that case it must so hold in this, even under the construction of the statute which those would give to it who are affected by the fact that article VIII, chapter 32, General Laws, is grouped with 12 other articles, the compilation being known as the Labor Law,

instead of being in the Domestic Law with articles entitled, Flour and Meal, Beef and Pork, or in the Public Health Law with articles such as Adulteration, Practice of Medicine or the like.

Again many medical authorities classify workers in bakers' or confectioners' establishments with potters, stone cutters, file grinders and other workers whose occupation necessitates the inhalation of dust particles, and hence predisposes its members to consumption. The published medical opinions and vital statistics bearing upon that subject *standing alone* fully justify the section under review as one to protect the health of the employees in such establishments, and it is the duty of this court to assume that the section was framed not only in the light of, but also with full appreciation of the force of the medical *authority* bearing upon the subject — authority which reasonably challenges the attention, and stimulates the helpfulness of the philanthropist.

The conclusion necessarily follows, therefore, from an examination of the statute in the light of the authorities cited, that the purpose of article VIII, and every part of it, including the provision in question, is to benefit the public; that it has a just and reasonable relation to the public welfare, and hence is within the police power possessed by the legislature. But if, in violation of the duty of the court as stated in *Brodger's Case (supra)* — which is " to adopt the construction which, without doing violence to the fair meaning of the words used, brings the statute into harmony with the provisions of the Constitution " — we award to the title of a general law such potency as causes it to overcome both the title and the provisions of an article therein, thus making the provision a labor law, we are still required to hold that it is within the police power.

The judgment should be affirmed.

GRAY, J. I shall concur with the chief judge; whose opinion I regard as carefully expressed and convincing in its reasoning. The question for us is, in the first place, whether,

notwithstanding its embodiment in the Labor Law, we may treat the statutory provision, in question, as a health law and, in the next place, if we may do so, whether its enactment is a reasonable exercise of the police power of the state, which the courts should give effect to. I am of the opinion that its being placed in the Labor Law furnishes no adequate reason for limiting its reading and construction by those considerations, which appertain to laws passed, strictly, in the interest of labor; if, from its association with other provisions, in *pari materia*, a different and independent purpose is disclosed. To deprive a health law of its intended operation, because it is not found in the statute book under that, or a kindred, title, would be, in my opinion, to apply an unreasonable and an unsatisfactory test of its validity. If the court concludes that the intent of an enactment in some valid exercise of the police power is to regulate some particular trade, or occupation, then, clearly, it should be quite immaterial under what heading it appears to be classified in the statutes. It would not do to nullify the will of the people upon so technical and narrow a consideration. Therefore, I think we may proceed, beyond that ground, to the determination of the question whether, if a health law, the 110th section of this article VIII was reasonable and, therefore, a valid exercise of the police power. If it stood alone, unaccompanied and unexplained by cognate provisions, I should incline to, the view that the enactment was unconstitutional. It might, justly, be held to fall within that class of legislation, which has received judicial condemnation; because, as a regulation of the hours of the employed, its object would appear to be for their protection against the exaction of a disproportionate amount of work for the wages paid. That would be to infringe upon the liberty of contract. But I think we must read the section in connection with those sections which immediately follow, and then it is that we find it to be made certain that the object of the legislative enactment had relation to the conservation of the public health. We perceive that the legislature is dealing with the workings of a business conducted upon a scale, calling for the employ-

ment of more or less laborers, and which is affected by a public interest, in the sense that the food product may, sensibly depend for its healthfulness upon the observance of sanitary rules and precautions. Such precautionary regulations may involve, as well, the establishment of proper conditions to insure the maintenance of the normal vitality of the workman, as the wholesomeness of the general environment. We must presume that the legislative body was animated by a reasonable intention to promote the public welfare and if the courts can give effect to it, because tending to guard the public health, they should, unhesitatingly, do so. Legislation will not be allowed, arbitrarily, to interfere with the personal liberty of the citizen, under the specious guise of an exercise of the police power, and therefore it is, that our courts may supervise, as a judicial question, a determination of the legislature to exercise the police power in restraint of some trade, or calling. It is true that the tendency has been growing in the direction of an excess of paternalism in government and that the courts of this and of other states have, rather, hastened to uphold legislative interference with the pursuits of citizens, upon any plausible pretext of its being in furtherance of the general welfare. The Federal Supreme Court has, in the broadest terms, recognized the power of the individual states to exercise a police power of internal regulation; when the object is to promote by reasonable laws the public safety, health and comfort. To the legislative body is conceded the power to govern men and the affairs of men, through the establishment of such rules and regulations as may be conducive to the public betterment, because tending to the protection of the lives, health and comfort of persons and the protection of property, and that concession has been, in my opinion, at times, more broadly made in the decisions of the courts, than the conservative spirit of our democratic form of government will justify. But that the legislature has, and should have, the broadest authority to exercise a police power of internal regulation, in the direction of protecting the peace, the safety and

the health of the community I fully concede. In this law, which restricts the working hours of employés in bakery and confectionery establishments, I think we may, fairly, perceive a statutory regulation, reasonably promotive of the public health, because compelling the master of such an establishment to conduct it in a manner, the least capable of affecting his product prejudicially. We may, not unreasonably, assume that an employé may work too long for his health under the conditions, and that an impaired vitality and the possible development of organic diseases may be the result. If, to obviate the possible consequences to the consumer of the food manufactured, the legislature determines to interfere, by limiting, among other regulations, the hours of the workman, I do not think we should hold the interference to be without reason.

VANN, J. I concur in the result reached by the chief judge, for the following reasons :

The power of the legislature to pass what it may consider "health laws" is not unlimited, but is bounded by the duty of the courts to determine whether the act has a fair, just and reasonable relation to the general welfare. (*Matter of Jacobs*, 98 N. Y. 98, 108; *People* v. *Gillson*, 109 N. Y. 389, 401; *People* v. *Havnor*, 149 N. Y. 195, 200.)

As was said by the court in the *Gillson* case : "Under an exercise of the police power the enactment must have some relation to the comfort, the safety, or the welfare of society, and it must not be in conflict with the Constitution. The law will not allow the rights of property to be invaded under the guise of a police regulation for the protection of health, when it is manifest that such is not the object and purpose of the regulation. * * * It is generally for the legislature to determine what laws and regulations are needed to protect the public health and serve the public comfort and safety and if its measures are calculated, intended, convenient or appropriate to accomplish such ends, the exercise of its discretion is not the subject of judicial review."

We have before us simply that part of the Labor Law

which regulates the hours of labor in bakeries and confectionery establishments by limiting them to not exceeding sixty per week and ten per day, " unless for the purpose of making a shorter work day on the last day of the week."

The draftsman of this statute apparently used as a model " The Bakehouse Regulation Act " passed by the English Parliament in 1863, but he went far beyond that pattern in limiting the hours of labor, for the New York statute applies to all employees in bakeries, while the English act makes no regulation of hours per day or week, but simply prohibits the employment of persons under eighteen years of age between nine at night and five in the morning. (26–27 Victoria, cap. 40.) Both acts contain similar provisions to secure cleanliness and ventilation of the rooms used to carry on the business, as well as the separation of sleeping apartments therefrom, none of which are now called in question.

I do not think the regulation in question can be sustained, unless we are able to say from common knowledge that working in a bakery and candy factory is an unhealthy employment. If such an occupation is unhealthy the legislature had the right to prohibit employers from requiring or permitting their employees to spend more than a specified number of hours per day or week in the work, because such a command would be in the interest of the public health and would promote the general welfare. As in the *Jacobs* case we took judicial notice of the nature and qualities of tobacco (p. 113), so in this case we may take judicial notice of the effect of very fine particles of flour and sugar when inhaled into the lungs from the heated atmosphere of manufactories of bread and candy. Necessarily in considering the subject we may resort to such sources of information as were open to the legislature.

Vital statistics show that those vocations which require persons to remain for long periods of time in a confined and heated atmosphere filled with some foreign substance, which is inhaled into the lungs, are injurious to health and tend to shorten life. Bakers and confectioners, who, during working hours, constantly breathe air filled with the finest dust from

flour and sugar, have a tendency to consumption, the most terrible scourge known to modern civilization and resulting in more deaths than any other disease. (1 People's Cyc. 479 ; Mulhall's Dict. Statistics, 193 and 683.)

Thus in the article on phthisis in volume 18 of the last edition of the Encyclopædia Britannica it is said : " Occupations which necessitate the inhalation of irritating particles, as in the case of stone masons, needle grinders, workers in minerals, in cotton, flour, straw, &c., are especially hurtful, chiefly from the mechanical effects upon the delicate pulmonary tissues of the matter inhaled. No less prejudicial are occupations carried on in a heated and close atmosphere, as is often the case with compositors, goldbeaters, semptresses, etc."

So in Alden's Encyclopædia, vol. 9, title consumption, the following occurs : " Often the workshops of tailors, printers, bakers and other businesses carried on in close, ill-ventilated apartments by large numbers of working people are nurseries of consumption."

We quote from a few more out of many authorities to the same effect. " It is certain that much might be done to improve the public health in this respect by more attention on the part of employers of labor to the comfort and habits of those who are, in more senses than one, their ' hands' and the sources of their prosperity. A certain kind of improvement has, indeed, been already effected by the improved living of the working classes during the last twenty years. Still it is well known and proved by careful inquiries that the workshops of tailors, printers, bakers and other businesses carried on in close, ill-ventilated apartments, by large numbers of workmen are, in a very aggravated sense, nurseries of consumption. * * * The cutters and needle-grinders of Sheffield appear to owe their notoriously short lives to consumption brought on by the inhalation of metallic particles in the close and stifling atmosphere of their workshops. * * * Even admitting, therefore, that the causes of consumption may be in part practically irremovable, there seems no reason to doubt that very much might be done to diminish

its prevalence, as well as to arrest its course when already formed, by due attention to the comfort of the laboring population, both in their dwellings and in the pursuit of their occupations." (4 International Cyclopædia, 286.)

" Particular occupations predispose (to consumption), especially such as occasion constant inhalation of small particles." (2 Johnson Cyclopædia, 488.)

" Thus tailors, seamstresses and similar workers are especially prone to the disease. More especially is this true of occupations whose performance necessitates the inhalation of dust particles.   *   *   *   The dust particles act as irritants of the fine structures which line the air passages and vessels, inducing chronic changes, which, in turn, are liable to lead to consumption." (3 Chambers Encyclopædia, 438.)

" The bacillus of tuberculosis finds, indeed, the most favorable conditions for its existence in the squalor of congested slums, in the foul atmosphere of dusty workshops, in close courts, alleys, etc." (70 Fortnightly Review, 308.)

" A very large number of the most efficient workmen employed in quarries, metal works, cotton and wool manufactories, print trades and many other occupations exposing them to bad air and dust fall victims to this infection." (194 Edinburgh Review, 444.)

" Since statistics still show that the mortality from Phthisis in people who follow certain trades is much greater than in others, there can be no doubt of the causal relationship between occupation and pulmonary disease and of dust being the *causa causans.*   *   *   *   In 1866 it was demonstrated that * * * two kinds of occupation had long been recognized as hurtful, viz.: 1, those that give rise to mechanical or chemical irritation of the air passages by dust, grit or fluff being diffused through the atmosphere; 2, those in which the operatives are exposed to abrupt changes of temperature." (The Lancet, vol. 165, p. 1345.)

" Living in a close atmosphere and in a high temperature, bakers are subject to lung diseases, more especially phthisis." (5 Reference Handbook of Medical Science, 276.)

" Those engaged in carding of cotton and workers in flax, hemp, tobacco and flour, and chaff cutters suffer in the same manner, but to a less degree than such as are compelled to inhale more decidedly irritating particles." (Fowler & God-lee's Diseases of the Lungs, 272.)

" Dusty occupations, as in the case of millers, bakers, knife-grinders, stone-masons, and the like, are fraught with special dangers to vulnerable persons." (5 Allbutt's System of Medicine, 229.)

" The inhalation of impure air in occupations associated with a very dusty atmosphere renders the lungs less capable of resisting infection." (Osler's Practice of Medicine 269.)

" Dusty occupations make people prone to disease. The statistics of Berlin as to street-cleaners, cabmen, coal workers and miners show this." (35 Journal Am. Med. Assn. 1028.)

" The question as to what business had best be carried on by tuberculosis patients is treated of by Ambler. * * * The butchers, he thinks, generally possess an immunity, at least that has been his experience, but bakers are particularly susceptible." (37 id. 1068.)

" Other vegetable dusts of less potency, which are little less injurious in results than mineral dusts, are flour and starch, which seem to operate rather by obstruction than by irritation. Bakers, confectioners and pastry cooks represent a body of tradesmen exhibiting hygienic conditions of a common character, the principal of which are exposure to heat from the ovens, dust, steam, variations of temperature, in too many instances unhealthy bakehouses, fatiguing movements necessitated where kneading is done by hand, disagreeable emanations from materials used, prolonged hours of work, more or less night work, and loss of rest. To these evils of their trade the working bakers often add intemperance and irregular living. My own senses also make me conscious of a disagreeable, sickly smell much like that of heated bones, superadded to the steam and other fumes. There are, in brief, many incidents in the occupation of baking which reduce vital energy, pre-

dispose to lung affections and shorten life." (Arlige Diseases of Occupations, 255.)

The occupations of ropemakers, carpetmakers, bakers, etc., "being essentially dust-producing processes, they one and all induce among workers excessive suffering from pulmonary affections. Although the mortality of these workers from phthisis and other lung diseases is considerably below that of metal workers, nevertheless it is in every case inordinately high, exceeding the mortality of agriculturists by proportions varying from 77 to 120 per cent." (Latham's Register-General's Report, 148.)

According to the data presented by Dr. C. Moeller in his work on Hygiene of the Baker Industry (p. 295): "of bakers dying between the ages of 45 and 65, twenty-five per cent died from chronic bronchitis or related diseases." He points out "the persistency of the flour dust and starchy particles in the bronchial tubes, and even in the lungs" by quoting a medical authority to the effect "that even two and a half weeks after leaving the employment, starchy particles and other evidences of flour dust had been found in the expectoration of bakers examined."

According to the tables of comparative mortality in the Federal census of 1900, the number of deaths among bakers and confectioners was three and two-tenths per cent greater than the average of general industrial occupations. These tables are somewhat favorable to bakers between the ages of 15 and 44, but are unfavorable to them between the ages of 45 and over, the average being as stated above. (See, also, 1 Parke's Manual of Practical Hygiene, 133; 62 Medical Record, 334; Medical Examiner and Practitioner, Nov. 1902, tit. Occupations; Id. July, 1901, tit. Occupation as affecting the Death Rate.)

The heaviest death rate in England falls to cabdrivers, painters, printers, tailors and bakers. (Mulhall's Dictionary of Statistics, 195.) Statistics relating to thirty-nine trades in England and Wales show that more bakers have consumption than the average of those engaged in other vocations, and the

table of male mortality in Paris shows higher death rate among bakers than in all but five out of twenty of the common callings of life. (Id. 688.)

While the mortality among those who breathe air filled with minute particles of flour is less than among those who work in stone, metal or clay, still it seems to be demonstrated that it is greater than in avocations generally. The dust-laden air in a baker's or confectioner's establishment is more benign and less liable to irritate than particles of stone or metal, hence, while bakers are classified with potters, stone masons, file grinders, etc., still they are regarded as less liable to pulmonary disease than other members of the class. The evidence while not uniform leads to the conclusion that the occupation of a baker or confectioner is unhealthy and tends to result in diseases of the respiratory organs. As statutes are valid which provide that women or children shall not be employed in any manufacturing establishment more than a certain number of hours in a single day, so I think an act is valid which provides that in an employment which the legislature deems, and which is in fact, to some extent detrimental to health, no person, regardless of age or sex, shall be permitted or required to labor more than a certain number of hours per day or week. Such legislation, under such circumstances, is a health law and is a valid exercise of the police power.

I vote for affirmance.

O'BRIEN, J. (dissenting). The defendant was convicted of a misdemeanor under one of the subdivisions of section 384 of the Penal Code, in that he violated article eight, section 110, chapter 415 of the Laws of 1897, known as the Labor Law. The indictment charges that on the twenty-first day of December, 1899, he was arrested upon the complaint of one of his employees for violating the law in *permitting* the employee to work in a bakery more than sixty hours in one week; that he was convicted in the City Court and fined twenty dollars, or in default thereof stand committed to the county jail for twenty days, and that he paid the fine; that after such conviction the defendant " wrongfully, unlawfully

and knowingly, with intent on his part to violate the law, *permitted and required* " another employee named to work more than sixty hours in one week during the week commencing April 19th and ending April 26th, 1901, in the defendant's biscuit, bread and cake bakery and confectionery establishment, thereby committing a misdemeanor as a second offense, contrary to the form of the statute in such case made and provided and against the peace of the People of the State of New York and their dignity.

The defendant demurred to the indictment on two grounds: (1) That more than one crime was charged; and (2) that the facts stated do not constitute a crime. The local court overruled the demurrer, and no plea having been interposed by the defendant the allegations of the indictment were taken as true, under section 330 of the Code of Criminal Procedure, and judgment of conviction was entered and the defendant sentenced to pay a fine of fifty dollars, or stand committed to the county jail until the fine was paid, not to exceed fifty days. The judgment was affirmed at the Appellate Division by a divided court, and from this judgment the defendant has appealed to this court, and the appeal brings up for review all the questions raised by the demurrer to the indictment.

The statute upon which the judgment rests is to be found in the Penal Code (§ 384 l) and reads as follows: " Any person who violates or does not comply with * * * the provisions of article eight of the Labor Law, relating to bakeries and confectionery establishments, the employment of labor and the manufacture of flour or meal food products therein * * * is guilty of a misdemeanor and upon conviction shall be punished for a first offense by a fine of not less than twenty nor more than one hundred dollars; for a second offense by a fine of not less than fifty nor more than two hundred dollars, or by imprisonment for not more than thirty days, or by both such fine and imprisonment; for a third offense by a fine of not less than two hundred and fifty dollars, or by imprisonment for not more than sixty days, or by both such fine and imprisonment."

It will be seen that this section of the Penal Code does not specify the acts or omissions which are made crimes, nor does it in any appropriate terms define the crime at all, but refers for that purpose to another law. When we turn to article eight of the Labor Law, referred to above, we find that it contains six separate sections, commanding certain things and prohibiting certain things. The particular section which the indictment charges to have been violated by the defendant is the first section of the article, or section 110, and that reads as follows: " No employee shall be required or permitted to work in a biscuit, bread or cake bakery or confectionery establishment more than sixty hours in any one week, or more than ten hours in any one day, unless for the purpose of making a shorter work day on the last day of the week; nor more hours in any one week than will make an average of ten hours per day for the number of days during such week in which such employee shall work." While this section of the Labor Law does forbid certain things, no penalty whatever is attached to a violation, and, therefore, in order to get a definition of the particular crime charged in the indictment we must examine two general statutes upon different subjects; that is to say, we must read the Penal Code for the penalty or the punishment, and we must read the Labor Law in order to ascertain the particular act or omission which constitutes the crime.

One of the grounds of the demurrer is that the indictment charges two crimes. It will be seen that two things or two acts or omissions have been forbidden by the statute; it forbids the master from either permitting or requiring the servant to work more than the time specified in the statute. Assuming for the present that the statute is valid, it makes it a crime for the master to permit the servant to work over the statutory time; and it also makes it a crime for him to require or compel the servant to so work. The two acts or omissions inhibited by the statute are essentially different in nature and character. It is one thing to permit the servant to work; it is quite another thing to compel or require it. Permitting him

to work more than the ten hours might be intentional or involuntary. Compelling or requiring him to work would be a deliberate act on the part of the master in violation of the statute. In the one case the punishment might very well be nominal; in the other case it would necessarily have to be substantial, and, hence, it would seem that two acts or omissions so essentially different in nature and character and each constituting a crime in itself could not properly be united in the same charge, and in this view the objection that more than one crime is stated in the indictment is good.

But the objection was also made that the acts or omissions stated in the indictment do not constitute a crime, and this objection raises the question as to the validity of the statute and is of much more importance than the form or substance of the indictment. It will be seen from an examination of the law that there is no prohibition against the act of the servant himself in working longer than the statutory time. He may work as many hours as he likes during the day and he violates no law and commits no offense whatever. So the broad question is whether a statute which makes it a crime for the master to permit his servant to do what the servant has a perfect right to do can be a valid law. No restrictions are imposed upon the servant with respect to the hours of labor or otherwise. As already remarked, he has a perfect right to work as many hours in a day or week as he may want to, but the master must see to it, at the peril of committing a crime, that his servants are driven out of the building the moment the clock registers the requisite ten hours, and that, too, without regard to the conditions and circumstances affecting the business or the interests of the master. It is a crime for the master to require or permit his servant to work over the statutory time, no matter how willing or even desirous the servant may be to earn extra compensation for overwork. The master is forbidden to contract with his servant for longer hours and extra pay, no matter what may be the wants or necessities of the business, or the judgment or will of the servant with respect to such a contract. It is obviously one

of those paternal laws, enacted doubtless with the best intentions, but which in its operation must inevitably put enmity and strife between master and servant. They are not left free to make their own bargains in their own way, but their mutual interests are governed by statute.

The sweeping character of the legislation in question may be illustrated by a reference to the last section of the article of the Labor Law referred to in the indictment; that is to say, to section 115. It is there enacted as follows : " If, in the opinion of the factory inspector, alterations are required in or upon premises occupied and used as bakeries, in order to comply with the provisions of this article, a written notice shall be served by him upon the owner, agent or lessee of such premises, either personally or by mail, requiring such alterations to be made within sixty days after such service, and such alterations shall be made accordingly." There is no penalty for a failure to observe this law in the law itself, but when we look into the amendments of the Penal Code we find that the owner of a valuable building used as a bakery may be at the mercy of the factory inspector, since, if it happens that the rooms are less than eight feet in height, he must tear it down and rebuild it, if the factory inspector so requires it, or be subject to a criminal prosecution, fine and imprisonment down to the third offense, and possibly so long as the orders of the inspector are not carried out. It is quite inconceivable that the legislature understood, when enacting the amendments to the Code by reference to another law, that its action would have such a sweeping effect or confer such arbitrary powers upon a ministerial officer that affected the liberty and the property of the individual.

It is contended in behalf of the defendant that the law under which he was convicted violates section one of article fourteen of the Constitution of the United States, which prohibits any state from making or enforcing any law which shall deny to any person within its jurisdiction the equal protection of the law, and those provisions of the Constitution of this state which enact that no member of this state shall be

disfranchised or deprived of any of the rights or privileges, secured to any citizen thereof, unless by the law of the land and the judgment of his peers, nor be deprived of life, liberty or property without due process of law. (Const. art. 1, §§ 1, 6.) The words "law of the land" do not mean an act of the legislature passed for the very purpose of working the wrong. The meaning is that no person shall be deprived of any of the rights or privileges secured to him by the Constitution, unless the matter shall be adjudged against him upon a trial had according to law. It cannot be done by mere legislation. (*Taylor* v. *Porter*, 4 Hill, 140; *White* v. *White*, 5 Barb. 474; *People* v. *Toynbee*, 20 Barb. 198; *Wynehamer* v. *People*, 13 N. Y. 378; *People ex rel. Warren* v. *Beck*, 144 N. Y. 237; *People ex rel. Rodgers* v. *Coler*, 166 N. Y. 1; *People* v. *Orange County Road Const. Co.*, 175 N. Y. 84.) The doctrine of these cases condemns the legislation in question as an invasion of the rights, liberties and property of the citizen. The three cases last cited grew out of the same law that is violated in the case at bar, or similar laws, and they cannot be distinguished from it in principle.

The Labor Law excludes from its regulations and restrictions all persons engaged in farm work or domestic service (Art. 1, § 3) and, hence, a very large proportion of the people of the state who labor for a living are not affected by it at all. Why this large class of wage earners who toil for a livelihood are excluded from the benefits of the statute, and those who employ them exempt from its burdens and restrictions, it is difficult to conceive. The farmers and that large class of people both in the city and in the country who employ domestics may require them to work any number of hours without violating any law. They commit no crime by requiring their servants to work from daylight till after dark or even into the night. The section of the law upon which the conviction in this case is based is aimed at a very small class of persons, namely, those who conduct "a biscuit, bread or cake bakery or confectionery establishment." Work of the same general character is exacted from cooks and domestic servants in practi-

cally all the private houses in the land and to a great extent in hotels, restaurants and other public places. It would be absurd to say that all, or even the greater part of the biscuit, bread, cake and confectionery consumed in this state comes from what are called bakeries. The law does not even apply to bakers in the small towns and villages who do their own work. It applies only to bakers who find it necessary to employ labor, and they alone are subjected to criminal prosecution in case they *permit* the servant to work more than ten hours in a day, even though the servant is willing and is given extra compensation. The baker is forbidden, under the penalty of fine and imprisonment, to contract or agree with his servant upon the hours of labor in such way as would be mutually beneficial, but his business is practically regulated by statute. If for any reason he suffers or permits his servant to work an additional half-hour beyond the statutory time his liberty and his property are put at the mercy of the servant, who may procure him to be arrested and imprisoned. It does not appear from the record in this case, or in any other way, that there is anything in the business or vocation of a baker that would authorize the legislature to impose such criminal penalties upon him for permitting his servant to work more than ten hours in the day, or to restrict his freedom of contract, which is a right enjoyed by all other employers of labor. The guaranties of the Constitution may be invaded without any physical interference with the person or property of the citizen. He is deprived of his property within the meaning of the Constitution when arbitrary and unnecessary restrictions are imposed upon his conduct of any lawful business, and when he is deprived of the right to make contracts for the transaction thereof. Liberty, in its broad sense, means the right, not only of freedom from actual restraint of the person, but the right of such use of his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation. All laws, therefore, which impair or trammel those rights or restrict his freedom of action, or his choice of

methods in the transaction of his lawful business, are infringements upon his fundamental right of liberty, and are void. (*Matter of Jacobs*, 98 N. Y. 98.) They cannot and should not escape the scrutiny of the courts merely because they are made to assume, by argument or otherwise, the guise of police regulations.

The statute in question deprives the defendant of the equal protection of the law, since it enacts that certain acts or omissions on his part concerning the conduct of his business and his relations to his own servants are crimes and punished criminally, which, as to all the rest of the community not within the terms of this law, are entirely innocent. The very small fraction of the community who happen to conduct bakeries, or confectionery establishments, are prohibited, under pain of fine and imprisonment, from regulating the conduct of their own business by contracts or mutual agreements with their employees, whereas all the rest of the community who find it necessary to employ labor in private business may do so. Class legislation of this character which discriminates in favor of one person and against another is forbidden by the Constitution of the United States, if not by the Constitution of the state; and so it has been held by the Supreme Court of the United States and by this court. (*Gulf, C. & S. F. R. Co.* v. *Ellis*, 165 U. S. 150; *Cotting* v. *Kansas City S. Y. Co.*, 183 U. S. 79; *Connolly* v. *U. S. P. Co.*, 184 U. S. 540; *People* v. *Orange County Road Constr. Co.*, 175 N. Y. 87, 90.) It is, I think, quite obvious that the legislation in question is, upon its face, in conflict with the constitutional guaranties referred to, unless it can be brought within the scope of the police power. That is the only ground upon which the statute is defended by the learned district attorney. He contends that it is a health law passed for the purpose of protecting the public health, or at least the health of those persons employed in bakeries. The argument is that the defendant was forbidden by the statute to permit his workmen to work more than ten hours in a day, to the end that his customers might have wholesome bread, biscuit and confectionery, whereas if they

were permitted to work ten and a half hours in the day the product of the bakery would be unwholesome or dangerous to health. What possible relation or connection the number of hours that the workmen are permitted to work in the bakery has, or can have, to the healthful quality of the bread made there is quite impossible to conceive. The baker in the small towns, or even in the large towns, who does his own work and does not employ labor, may work day or night without fear of molestation, since no one thought it necessary to protect the public against his unwholesome product. It has already been observed that the law does not impose any penalties or restrictions upon the workman himself for working too much, and if the purpose was to protect his health against his own avarice, or his own misdirected energy, it is quite remarkable that it did not at least forbid him from working more than ten hours in a day.

The contention that the defendant was convicted for violating a health law is, at best I think, but a mere disguise that is not sufficient to save the statute from condemnation. There is nothing on the face of the law nor in its manifest operation to show that it has any relation to the public health. It is no part of the Health Law but a part of a general statute known as the Labor Law. The execution of it was not intrusted to any of the health authorities, but to the factory inspector, which shows what its real scope and purpose was. The factory inspector is not the officer charged with the enforcement of health laws. The legislature classified it as a labor law, and it is that and nothing else. Laws which encroach upon the personal or property rights of the citizen, as guaranteed by the Constitution, are generally defended upon the ground that they are police regulations; but the courts have prescribed a test by means of which their true character and purpose may be known. The rule is that the court must be able to say judicially that the statute in question *is* a health law, and has some appropriate relation to the promotion or protection of health. It will not be deceived or misled by mere names or pretenses. The cases are numerous in which the

courts have condemned statutes as invasions of the rights secured to the citizen by the Constitution, though enacted or sought to be upheld under the guise of health laws or other police regulations. They all arrive at the same result, and that is that the legislature may not under the guise of a statute to protect against some wrong, real or imaginary, arbitrarily strike down private rights and invade personal freedom or confiscate private property. The police power must be exercised within its appropriate sphere and by appropriate methods. (*Matter of Jacobs, supra; People* v. *Marx,* 99 N. Y. 377; *People* v. *Arensberg,* 103 N. Y. 388; *People* v. *Gillson,* 109 N. Y. 389; *Colon* v. *Lisk,* 153 N. Y. 188; *People ex rel. Rodgers* v. *Coler,* 166 N. Y. 1; *People* v. *Buffalo Fish Co.,* 164 N. Y. 101, 104; *People* v. *Hawkins,* 157 N. Y. 1.) It will not do to say that the legislature in enacting the statute in question may have thought that it was a health law, or had some relation to health. The action of the legislature, or its views or reasons for the passage of the law, does not conclude the courts, but they must determine for themselves whether in any given case the legislation which is claimed to be an exercise of the police power is really what it is claimed to be. Every labor law, however stringent and arbitrary, could just as well be upheld upon the ground that it is a health law; but in all the discussions that have been had in the courts for many years concerning the validity of legislation of this character, there are to be found but very few cases where it was even claimed that the statute was enacted for the purpose of preserving or promoting health, or that it had any relation whatever to that subject. When it is manifest, as it is in this case, that the law has no relation whatever to the subject of health, and that its real object and purpose was to regulate the hours of labor between master and servant in a business which is private and not dangerous to morals, or to health, freedom to contract with each other, defining their mutual obligations, cannot be prohibited without violating the fundamental law.

The defendant was charged in the indictment with the violation of a single independent section of article eight of the

Labor Law, namely, the first section, which relates solely to the hours within which the master may permit the servant to work.  The validity of that section is not affected or helped out by the character of some of the other sections of the article, since part of a statute may be perfectly valid and another part in conflict with the Constitution.  It is quite possible that some parts of the other five sections can be regarded as prescribing sanitary regulations, such as ventilation, plumbing, fire escapes and the like, but such regulations cannot save the first section which deals exclusively with the time within which the servant is to work and virtually makes a contract to be observed by the master alone, leaving the servant just as free as if the law had never been passed.  A section, or sections, of a statute may be good that requires and prescribes sanitary regulations binding upon the landlord who owns and lets tenement houses in cities, but this would not save another section of the statute that prescribes the maximum rent that he may demand and receive from his tenants.  It is even quite possible that a law might be held good that enjoins upon farmers or persons employing domestic help the duty of preserving their health against infectious diseases by reasonable and proper safeguards, such as ventilation of the rooms where they sleep and the like, but this would not save a separate section of the law prescribing the compensation that the master is required to pay to the servant.  So that the section of the Labor Law with which we are now concerned can borrow no strength from its association with other sections of the statute that may be good.  The single section of the Labor Law that we are now dealing with must stand or fall upon its own intrinsic character and can receive no support from the company in which it is found.  If that section had also provided that every employee of a baker would be guilty of a misdemeanor if he neglected or refused to faithfully serve his master for ten full hours in each day no one I apprehend would then claim that it was a health law.  And yet every argument and every authority cited in defense of the section in its present form would be just as good then as they are

now. The section would then be just as much of a health law as it is now.

It cannot be repeated too often that if the single section of the law with which we are now concerned and which is the sole basis of the criminal charge in this case, stood alone, the argument that it is a health law and within the police power would not have even a color of reason or authority to support it. But what the learned district attorney urges upon us is that since the section is found in the article associated with other sections prescribing sanitary regulations, we must assume that the legislators, for some unexpressed reason sufficient to them, reached the conclusion that a baker ought not to be permitted or required to work on an average of more than ten hours in a day. Of course this reasoning is without force and does not meet the difficulty. The question is not what the unexpressed reason is that moved the lawmakers, so long as it is impossible for any court to discover that reason or any reason to bring the enactment within the scope of the police power. It is always open to the courts to inquire and determine whether a statute is in fact fairly within the police power. That principle is found imbedded in all the cases on that subject. If it were otherwise and the real view of the legislature is made the dominant idea, then the court would be deprived of all power to declare any law void provided the legislature called it an exercise of the police power, or some one contended that it was supposed to be such upon some theory that the public interest required its enactment. There would be no limit then to the police power and every statute however arbitrary and in violation of the constitutional safeguards for the protection of life, liberty or property could be upheld on the plea that the lawmakers called it a health law or intended it as such, or thought it was necessary for that purpose. It is incumbent upon the courts to see to it that such laws are really what they profess to be, or if claimed to be police regulations that they are such within the reasonable scope of that power.

The bakers' vocation is one that has existed practically in

all ages and in all countries. Wherever cereals are converted into bread, the standard food of the human race, except possibly as to those races that are considered savage or semi-savage, the making of bread is one of the most common employments. The process is familiar to the domestics in every public or private house in the land as well as in the places called bakeries, where bread is made for sale to the public. It has never been supposed that it was a trade or vocation that was or might be dangerous to health, morals or good order, or that there was anything about it to justify legislation restricting the right of the master and servant to make their own contracts, express or implied, with respect to hours of work or the terms of employment. There is nothing in the record before us from which it can be inferred that there was any ground for the passage of the statute as a police regulation for the protection of health, morals or good order, and, hence, it cannot be upheld as an exercise of the police power. It is a plain discrimination against a limited class of people who happen to be obliged to employ labor in the manufacture of bread, biscuit or confectionery in those places called bakeries. This relatively small class are restricted by the statute to the regulations there prescribed with respect to the hours of labor by their employees and are prohibited from agreeing with them as to the time they are to work even though extra pay should be given for overwork, a right which the law gives to all other persons employing labor. If the legislature can do all this, then the right to enact what wages the servant shall receive per day or per hour must necessarily follow as an inevitable conclusion. A statute fixing the wages of the servant at such a sum as to enable him to live more comfortably could be defended as a health law by the same argument and authority adduced in support of the section of the present law, the violation of which is the only crime charged.

It is doubtless within the power of the legislature to enact that a ton of coal or a bushel of wheat shall contain a certain number of pounds; but it cannot prohibit parties from entering into contracts to the effect that a ton of coal or a bushel of

wheat shall contain more or less than the quantity prescribed by statute. When there is no contract regulating the matter, and there is a dispute between the parties as to what constitutes a ton of coal or a bushel of wheat, the statute would doubtless be available to settle the controversy. So in the case of the master and servant with respect to the number of hours that shall constitute a day's work. The legislature may no doubt define what is or shall constitute a day's work, but it cannot prohibit the parties from making agreements for themselves, and then custom or contract, express or implied, would control the mutual obligations of the parties.

The facts stated in the indictment do not constitute a crime, and, therefore, the demurrer must be sustained, the judgment of conviction reversed and the defendant discharged.

BARTLETT, J. (dissenting). I agree with Judge O'BRIEN for reversal. In one of the encyclopædia authorities cited for respondent it is said : " Bakers and confectioners who, during working hours, constantly breathe air filled with the finest dust from flour and sugar, have a tendency to consumption," etc. The authorities cited condemning the calling of a baker as unhealthy, doubtless refer to localities where they grind the grain, loaf-sugar and other materials used. It may be observed in passing that " the medical authorities without number " might lose some of their force if the writers were, where they should be, in court and subjected to cross-examination.

It is common experience that the baker, like the cooks in hotels, restaurants and private families, has provided for him in his business flour, sugar and the other ingredients duly prepared for immediate use. The claim that the compounding of these constituents, so prepared, in the business of a baker, is an unhealthy occupation, will surprise the bakers and good housewives of this state. The grinding of steel, like the needle-grinding of Sheffield, England, and of other similar materials and substances, causing clouds of impalpable dust, is not to be confounded with the avocation of the family baker engaged in the necessary and highly appreciated labor of pro-

ducing bread, pies, cakes and other commodities more calculated to cause dyspepsia in the consumer than consumption in the manufacturer.

The country miller of fifty years ago who passed a long and happy life amid the hum of machinery and the grinding process of the upper and nether stones, little dreamed of a coming day when the legislature, in the full panoply of paternalism, would rescue his successor from the appalling dangers of the life he led until old age summoned him to retire.

It has been frequently said that the limits of the police power cannot be accurately defined; that it is not desirable the legislature should be thus trammeled.

When this court held that the legislature acted in the legitimate, undiscriminating exercise of the police power in compelling all barbers to observe strictly the first day of the week, commonly called Sunday, except in the village of Saratoga Springs and the city of New York, the legal profession doubtless concluded that the elasticity of the undefined had arrived at its *Ultima Thule*. (*People* v. *Havnor*, 149 N. Y. 195.) That this conclusion was erroneous is shown by the fact that the case is now doing duty against the baker when men in kindred occupations are permitted to work as many hours as necessity dictates.

Another question in this case is whether section 110, contained in article 8 of the Labor Law (Chapter 415, Laws of 1897), is within the police power. This section is contained in article 8, which consists of sections 110, 111, 112, 113, 114 and 115. I am of the opinion that all the sections of said article, excepting section 110, are within the police power, relating as they do to sanitary conditions concerning the business of a baker. Placing section 110, relating exclusively as it does to hours of labor in bakeries and confectionery establishments, in article 8, does not bring it within the police power.

In a recent case this court said : " In the interest of public health, of public morals and of public order, a state may restrain and forbid what would otherwise be the right of a

private citizen.    It may enact laws to regulate the extent of labor which women and children or persons of immature years shall be allowed to perform, and prohibit altogether their employment in dangerous occupations. (*Commonwealth* v. *Hamilton Mfg. Co.*, 120 Mass. 383; Tiedeman's Police Power, § 85.)" (*People* v. *Orange County Road Cons. Co.*, 175 N. Y. 84, 87, 88.)

The state may also regulate the hours of labor in deep and unhealthy mines, and in any vocation where it is pursued at the risk of health and life.    It is because I believe that the occupation of a baker does not fall within these general principles, and the array of authorities cited, I vote for reversal.

PARKER, Ch. J., GRAY and VANN, JJ., read for affirmance, and HAIGHT, J., concurs; O'BRIEN and BARTLETT, JJ., read for reversal, and MARTIN, J., concurs.

Judgment affirmed.