# STATE OF NORTH DAKOTA v. C. J. OLSON.

(— L.R.A.(N.S.) —, 144 N. W. 661.)

**Statutes — snuff — substitute — construction — constitutional — property — depriving of — without due process.**

1. Chapter 271 of the Laws of 1913, which makes it unlawful "for any person, firm, or corporation to import, manufacture, distribute, or give away any snuff or substitute therefor, under whatever name called, and as defined in this act," and which defines snuff as "any tobacco that has been fermented or dried or flavored or pulverized or cut or scented or otherwise treated, or any substitute therefor or imitation thereof, intended to be taken by the mouth or nose," and which further provides that "ordinary plug, fine cut, or long cut chewing tobacco, as now commonly known to the trade of this state, shall not be included in such definition," is constitutional, and cannot be assailed upon the ground that it deprives any person of life, liberty, or property without due process of law, or denies to any person the equal protection of the laws.

**Courts — judicial notice — tobacco — use of, uncleanly and injurious.**

2. The courts can take judicial notice that the use of tobacco in any form is uncleanly, and that its excessive use is injurious.

**Judicial notice — use of tobacco by the young — effects.**

3. The courts may take judicial notice that the use of tobacco in any form by the young is injurious, and that the use of snuff is especially so.

**Police statutes — right to liberty — property — relation to public health — morality — public welfare — unreasonable interferences.**

4. Police statutes can only be set aside as unreasonable interferences with the right to liberty and property if it can be said that they cannot possibly have any reasonable relation to the public health, morality, or to the real public welfare.

**Courts — snuff — manner of use — cognizance.**

5. The courts may take cognizance of the fact that snuff in North Dakota is generally used by holding it between the lip and the gums without mastication, or by plastering it upon the gums, and that it is absorbed rather than chewed.

**Courts — judicial notice — tobacco — use of — snuff — use of, by young — manner of use.**

6. The courts may take judicial notice that tobacco held between the lip and the gums, or plastered upon the gums, and absorbed rather than chewed, can be used by the schoolboy with less possibility of detection than tobacco which is masticated.

**Judicial notice — drugs — opium — mingled with snuff — use of.**

7. The courts can take judicial notice of the general fear in the community that drugs and opium are and can be more easily mingled with snuff, and be less readily detected, than in other forms of tobacco.

**Police laws — omnibus in character — need not be.**

8. Police laws need not necessarily be omnibus in their character, and it is permissible to legislate against one form of evil even though many other and similar evils have not been condemned.

**Vice — general — condemnation — specific — prohibited.**

9. It is not necessary to condemn all forms of vice in order that any particular form may be prohibited.

**Criminal — punishment — comparative crimes — immaterial — injurious products — regulation of use.**

10. No criminal should be allowed to complain or escape punishment because someone else is more of a criminal or more dangerous to society than he; nor should any product which is injurious to the community escape regulation and condemnation because there are others equally injurious which are not regulated or forbidden.

**Property — inalienable right — nuisance.**

11. There is no vested and inalienable right of property in that which is a nuisance.

**Statutes — construction — exemptions — class legislation.**

12. The fact that chapter 271 of the Laws of 1913, familiarly known as the anti snuff act, exempts from its provisions "ordinary plug, fine cut, or long cut chewing tobacco as now commonly known to the trade of North Dakota," does not render such statute invalid or subject to the charge of class legislation.

**Words — use of — dictionaries.**

13. Dictionaries do not give to words their meaning; they only chronicle that which has been done, and the use must precede the chronicling.

**Snuff — has defined meaning — manner of use.**

14. In North Dakota the word "snuff" has a well-established meaning in the popular mind, and includes any tobacco, whether fermented or not, which is finely cut or ground and dried in order that the same can be taken into the mouth and absorbed without the necessity of mastication, and is naturally adapted to such use, even though it is not usually taken in the nose.

**Courts — notice of words and their use — jurisdiction.**

15. The courts of North Dakota can take judicial notice of the meaning generally given to words and terms within their jurisdiction, even though such meaning is not the one generally given in the world at large.

26 N. D.—20.

**Title of act — prohibits make or sale of articles — substitute — validity.**

16. A title which prohibits the manufacture or sale of an article is broad enough to include substitutes therefor.

Opinion filed November 26, 1913.

Appeal from the District Court of Stark County, *Crawford,* J.

Defendant was convicted of violating the provisions of chapter 271 of the Laws of 1913, relating to the sale of snuff, and appeals.

Affirmed.

Statement by BRUCE, J.   The defendant appeals from a judgment of the district court of Stark county, finding him guilty of violating chapter 271 of the Laws of 1913, which is familiarly known as the "anti snuff act." The statute under which the defendant was prosecuted and convicted reads in part as follows: "An Act to Prohibit the Importation, Manufacture, Distribution, Transportation, or Sale of Snuff, or Any Substitute Therefor, and Providing a Penalty Therefor, and to Repeal Chapter 277 of the Session Laws of North Dakota of 1911. Be it enacted by the legislative assembly of the state of North Dakota: Sec. 1. (Sale of snuff prohibited.) It shall be unlawful for any person, firm, or corporation to import, manufacture, distribute, or to give away any snuff or any substitute therefor, under whatever name called, and as defined in this act. Sec. 2. (Snuff defined.) For the purpose of this act, snuff is defined as any tobacco that has been fermented or dried or flavored or pulverized or cut or scented or otherwise treated, or any substitute therefor or imitation thereof, intended to be taken by the mouth or nose; Provided, however, that ordinary plug, fine cut, or long cut chewing tobacco, as now commonly known to the trade of this state, shall not be included in such definition." The specific offense charged in the information was that the defendant sold "Four 1-oz. packages or boxes labeled 'Right Cut Chewing Tobacco,' and containing, as said Olson then and there knew, tobacco that had been fermented, flavored, pulverized, cut, scented, or otherwise treated, and intended to be taken by the nose or mouth, said tobacco so prepared and so sold as aforesaid being then and there snuff, and intended to be used as snuff, the same not being ordinary plug, fine cut, or long cut chewing tobacco, as commonly known to the trade of this state."

The points on which a reversal is sought are summarized as follows:

(1) The act as a whole is unconstitutional as unwarranted discrimination.

(2) The act, when properly construed, applies to snuff, and snuff only, and does not apply to substitutes for snuff.

(3) "Right Cut" is not a snuff, or a substitute for a snuff.

(4) To exclude "Right Cut" from the markets of North Dakota, while permitting the sale of other chewing tobaccos, would be a denial of the equal protection of the law, and would therefore be unconstitutional.

(5) If the act be construed without reference to the title, and free rein given to the language of the definition, then we have a case of class legislation, which can be cured only by avoiding the act as a whole.

One witness, a merchant, testifies that he has handled snuff until January or February, 1913; that the acceptation and meaning of the word "snuff" as used in his trade is a chewing tobacco in little round boxes; that they would take a pinch of it and chew it, put in their mouth, sometimes rub it in their gums; that it requires no mastication, and that other tobaccos require some chewing, as he understands it; that he handled, previous to July 1st, 1913, a large amount of Copenhagen snuff; that he had customers show him what they said was Right Cut chewing tobacco, that looked like Copenhagen, and ask him to get it for them; that they wanted him to get it in the place of the snuff that he had been selling them, Copenhagen; said that they could use it in place of snuff; that his manager ordered some Right Cut; that he was familiar with Copenhagen; that his familiarity with snuff and tobacco would lead him to think that Right Cut was a good substitute for Copenhagen; that when he used the word "snuff" he meant Copenhagen as sold in these little round boxes, dark heavy snuff used for chewing; that he didn't mean nasal snuff; that he wasn't an expert, and testified from his general knowledge as a merchant in handling tobacco for some fifteen years; that several of his customers got Right Cut chewing tobacco right there in town; that he didn't recollect whether they ordered a second time from him; that the ones who bothered him the most were the men working on his building; that he was putting up a building in addition to the store, and they were snuff users, and he

guessed they ran out of snuff; his brother said he ordered it for them; that it would seem that a user of snuff could get along with Lorillard's Dark Shorts, that he couldn't tell whether it could be substituted for snuff; that it smelled as though it might be used as a substitute for snuff; that it didn't appear to be as fine; it don't seem powdered as Right Cut; that his reason for thinking that Right Cut could be used as a substitute for snuff was what his customers told him; that about a dozen customers told him that, a dozen out of about four hundred; that they were men that he was well acquainted with; that he thinks the rest of the snuff users went without snuff, took other forms of tobacco; that externally Right Cut and Copenhagen looked alike; that he could not distinguish very much difference in the odor; that to him they smelled alike.

Another witness testified that he was a physician and surgeon of about fourteen years' standing; that he was not a tobacco user himself; that in his opinion the use of tobacco was in some degree injurious to the human system; that the regular school of medicine so recognized it; that Exhibit A–1 (the package of Right Cut) was snuff; that he had seen snuff a great many times, but was not a user of tobacco himself or a user of snuff; that in North Dakota snuff is used in two ways, the form that is drawn in the nose, and the form that is inserted in the mouth, might say chewed, although they did not masticate it, he guessed, when they used it, commonly called "chewing snuff;" that he would distinguish between chewing tobacco and snuff taken in the mouth in the manner of its use; that in the users that he had seen, the snuff user took and inserted it in the cavity of the lip and held it there, while a user of tobacco took a piece of tobacco and at intervals masticated it, whereas the snuff user practically did not masticate it at all, seemed to hold it in his buccal cavity; that snuff, or tobacco that is used as snuff, when taken in the mouth, is finer than ordinary chewing tobacco; that a man using the ordinary plug or long cut or fine cut chewing tobacco would expectorate more than a man using snuff; that the snuff user would expectorate considerably less, a great deal less; that the most injurious ingredient of tobacco was alkaloid nicotine, though there are other things that are quite as injurious; that it is chiefly harmful because of the nicotine; that a person would get more nicotine from fine tobacco than from coarse tobacco; that all of the tobacco that he had seen which

had been as fine as Exhibit A–1 (Right Cut) had been called "snuff;" that he had examined Exhibit A–1 and tasted it and smelled it and spread it on paper so as to get an idea of the size of the particles; that it was tobacco, that he would say it was snuff; that he had seen snuff a good many times; when he said that it was snuff, he meant that it was finely pulverized and might be either used in the nose or mouth; that from its appearance and moisture he should judge that it was what is used in chewing, used in the mouth; that the strength could be gotten out of it without mastication and with little manipulation, as distinguished from the ordinary fine cut or long cut chewing tobacco; that the harmful effects of tobacco are in proportion to the amount of the strength which you get out of it; that finely cut tobacco soaked in saliva would give off a quicker and stronger infusion of nicotine than other forms; that his experience with snuff users was so limited that he didn't think he would be able to express an opinion as to whether snuff users were more addicted to drug habits than other forms of tobacco users, but that one particular friend of his that used snuff became a marked user of drugs; that he didn't know anything about the manufacture of tobacco; that his conclusion that the product was snuff was based purely upon observation, his sense of sight and smell and other things; that he had never observed the relative effects between Right Cut and Copenhagen.

Another witness testified that he was a graduate of the University of Michigan and a professor in the Agricultural College at Fargo; that he had made an analysis of Right Cut and of Copenhagen snuff; that in Copenhagen snuff the tobacco has lost about 50 per cent of its moisture, and the same was practically true of Right Cut; that in one sample of Right Cut he got 3.49 per cent and in another 3.75 per cent nicotine, and in one sample of Copenhagen snuff 3.27 per cent and that the other ingredients were essentially the same; that in external appearance Copenhagen snuff and Right Cut are apparently the same; that they have a characteristic odor which is different from ordinary tobacco; that they have almost identically the same taste and, as near as he could tell, the same effect; that he did not know of any tobacco that contained as large a percentage of nicotine, outside of Copenhagen, as was contained in Right Cut; that Right Cut can be used in the same way as

Copenhagen snuff; that he did not know of any tobacco that was put on the market in as fine a form as Right Cut.

Another witness testified that he had used snuff for about ten years, Copenhagen mostly; that he had seen Right Cut; that it is a ground tobacco; that it is a good substitute for snuff; that he tried it, however, and did not like it, and did not buy any more of it; that in appearance it is like Copenhagen, except that it is a little coarser; that you cannot chew Right Cut any more than Copenhagen, because it would go all over one's mouth and down his throat and make him sick; that the way to handle it is to take a pinch and put it between the lip and the gum; that Right Cut can be handled in the mouth the same as Copenhagen; that the first he ever saw of Right Cut was in the latter part of June; that he tried and did not like it, and did not buy any; that when he took too much Copenhagen it made him dizzy and sick.

Still another witness testified that he had used Copenhagen snuff for about five years; that he got a box of Right Cut the latter part of June; that that answered the same as Copenhagen, to his notion; that it could be used the same way; that no person could chew it, it was too fine; that he saw no other kind of tobacco as fine as Right Cut; that it smelled and tasted quite a little like Copenhagen, almost the same; that Right Cut was stronger than Copenhagen to a certain extent; that he liked it pretty well, but not as good as Copenhagen; that he has used tobacco once in a while since the snuff law went into effect; that since that he has mostly smoked, in a way as a substitute for Copenhagen.

A witness for the defense testified that Copenhagen is cut twice, and Right Cut only once; that Copenhagen is subjected to a process of fermentation, and that Right Cut is not; that the period of fermentation of Copenhagen is several months; that Right Cut is made from the same stock as Copenhagen; that the leaves for Copenhagen went into one machine and for Right Cut into another; that the first cutting of Right Cut was similar to the first cutting of Copenhagen; that he never saw any tobacco in any form except snuff that was put up as fine as Right Cut; that after the cutting and before the sifting, it was dried by going through a rotary drier at about 150 or 160 degrees of heat; that it was then thoroughly dry to the touch; that after it was dried it was put into a large sieve and shaken through the mesh into a box below; that it was then flavored and water added in connection with the flavor; that

then it was allowed to dry until the flavor had penetrated, and then it was packed; that as far as he knew, there was no distinction between snuff taken by the nose and by the mouth, as far as the amount of nicotine contained was concerned; that he did not know whether a person could masticate it, probably not, he was not a chewer; that the flavoring in Right Cut and Copenhagen was of the same general character; that Copenhagen is really a chewing tobacco and that snuff is a misnomer; that he had never seen it used in the nose; that he should say that Right Cut was less closely related to snuff than Copenhagen, on account of its not being fermented; that it is similar to Copenhagen as a chewing tobacco; that there was a fairly close resemblance between the two; that the general flavoring was the same; that it would be held the same way; that a pinch of it would be inserted between the lip and the gums and allowed to lie there; that after they were placed in the mouth they would both be used the same; that one would be a substitute for the other, from the point of view that they were not masticated; that he could not tell whether a user of Copenhagen would be fairly well satisfied with Right Cut; that Right Cut is nearer ordinary fine cut than it is to Copenhagen; that if snuff is a misnomer for Copenhagen, it has been a misnomer for nearly eighty years; that he had been told that only a small proportion was used for the nose; that he had never seen it used that way; that Copenhagen was not a nasal snuff; that Right Cut had some resemblance to Copenhagen, and many differences; that it was a short cut; that it resembled Copenhagen more in appearance than any tobacco he had seen, but not in character; that he did not know of any form of chewing tobacco that so closely resembled Copenhagen as Right Cut; that there wasn't any; that Right Cut came nearer Copenhagen than any form of chewing tobacco that he knew of, because it was cut uniformly and the character of the leaf was the same, but that the treatment was entirely different; that the flavoring was practically the same; that Right Cut was nearer ordinary fine cut than it was Copenhagen; that he had heard the statement that the use of snuff led to drug forming habits, but that he would not call it a wide-spread feeling; that he had frequently investigated the rumors about snuff and cigarettes, and found them to be without any foundation, but nevertheless the idea was never downed.

The defendant himself testified that he was the division manager of

the Weyman-Bruton Company; that he handled Right Cut and Copenhagen; that at first Right Cut was sold mostly to Copenhagen users, but as a rule the men that used Copenhagen would buy one or two boxes of Right Cut and go back to Copenhagen; that he used a good many kinds of fine cut, but none of them as fine as Right Cut; that he did not know of any fine cut that was as fine as either Right Cut or Copenhagen; that Copenhagen was the biggest part of the snuff sold in his territory, probably 85 per cent of it; that in North Dakota when people spoke of snuff, he knew they meant Copenhagen; that Right Cut looked more like Copenhagen than any tobacco that he knew of, and smelled more like it; that a user of Copenhagen would not expectorate; that a user of Right Cut would expectorate a little more, but not as much as he would chewing plug or long cut or fine cut; that Right Cut was put on the market about the first of the year; that in North Dakota, if people spoke of snuff, it would convey to him the meaning Copenhagen; that when we speak of snuff without putting any other words with it, we mean tobacco in fine form that can be placed in the mouth and the juice gotten out of it without biting; that you can do that with Copenhagen and with Right Cut; that he did not think that Copenhagen and Right Cut looked alike; that Right Cut looked more like Copenhagen than any other tobacco, and smelled more like Copenhagen than any other tobacco; that in his opinion there was no similarity in taste.

One of the vice presidents of the manufacturing company testified that he had been chewing Copenhagen for seven or eight years; that Right Cut could be used without mastication, but that a person can get a good, satisfactory chew of Right Cut without biting; that that was one of its virtues; that a tobacco user might experience some difficulty in masticating Right Cut; that the principal virtue of Right Cut was that the user did not have to manipulate it to get the taste out of it; that it could be carried in the mouth without a lump; that Right Cut was a tobacco that had been dried, cut, flavored, and sieved; that Right Cut was not ordinary long cut, nor ordinary fine cut, nor scraps nor twist nor cigar clippings, nor a by-product of tobacco manufacturers, nor shorts; that it was sifted through a very fine screen; that you cut Right Cut with a knife operated by machinery; that the

knives made a good many revolutions a minute; that they are in a cylinder.

· The president of the manufacturing company testified that he first conceived the idea of manufacturing Right Cut about seven years ago; that immediately after the dissolution of the American Snuff Company he was made president of the Weyman-Bruton Company, and started in with his experiments, and Right Cut is the result; that the cut or shred of long cut was a little coarser than fine cut; that he can never understand why the orginal George Weyman, in 1835, called Copenhagen "snuff;" that it was a fine cut tobacco; that the difference between Copenhagen and Right Cut was that Right Cut was cut only once, and Copenhagen was cut twice; that Right Cut was not fermented, Copenhagen was fermented; that Right Cut tobacco was made for a chew, and was advertised for a chew, and not to be snuff; that Right Cut was made from the leaf into the finished product in a day, while it takes from nine to nineteen weeks to manufacture Copenhagen; that the reason why Right Cut was as fine as it is, being only cut once, is that it is not as fine as it appears to be; the shreds are long in comparison with their width, but being cut very thin in the process of manufacture, after it is cut and dried it breaks very quickly and easily; however, in this broken state we are enabled to take out of it the stems; Right Cut tobacco, though only cut once, is broken in handling it until it is reduced to its present fineness; that Right Cut chewing tobacco is packed in the same kind of boxes as Copenhagen; that snuff is used both in the mouth and the nose; that Copenhagen has been used as snuff, but that it should be called tobacco; that it has been held by the nostrils, but most of it chewed; that a part of the Mayflower Shorts are as fine as Right Cut, but that the same care has not been used to have it as fine a fiber as has been used in Right Cut; that all shorts contain a large percentage of tobacco that is as fine as Right Cut, but none of them are as uniformly fine as Right Cut; that they are not as uniform in every respect; that the grain or shred of Right Cut, however, is not uniform; it simply does not contain any very long shreds; that Right Cut, before being finished, was screened to take out the stems; that Right Cut tobacco is fine enough so that it could be inhaled the same as broken cigarettes are inhaled; that it is fine enough as it comes from the can

without further breaking; that it would not, however, have the same effect as snuff.

One Brown, who appears to have been in the tobacco business for thirty-three years, testified, among other things, that the thing that distinguished snuff from other tobacco was the fact that snuff was powdered, pulverized, and fermented. He, however, testified that he never saw any tobacco as fine as Right Cut, not as uniformly fine; that Right Cut could be readily used for snuff.

The testimony of J. W. Snead and George G. Dibel, both tobacconists, is to the effect that Right Cut is more uniformly fine than any fine cut. The same is true of the testimony of one Bernard Dunn, who also testifies that Right Cut could be easily and readily drawn into the nose; that he never saw any tobacco so uniformly fine. One F. P. Jack testified that the only purpose of sweating or fermentation is to take the rankness and greenness out of the leaves. He defined snuff as tobacco which has been ground, cased, and sweated.

John M. Devoe testified that he was manager of the Chicago branch of Weyman-Bruton Company; that all tobaccos were fermented before they came to the manufacturer; that snuff was tobacco finely ground, more or less fermented, and intended strictly for the nostrils; that Right Cut is not placed on the market until it is dried and sieved; that sieving removes the stems; that it breaks up in the course of sieving; that Copenhagen is a fine cut, did not know why it was called "snuff;" that Right Cut and Copenhagen were both cut with a machine, Right Cut once and Copenhagen twice, but that Right Cut is cut with a finer machine, Copenhagen is a coarser cut; that the finished product of Copenhagen, however, has been fermented, whereas Right Cut has not, that makes a wide difference; that no tobacco has the same uniformness or evenness of grain as Right Cut; that some tobaccos that were not snuff were fermented in the process of manufacture, and that extra fermentation was not necessarily peculiar to snuff; that the sieve used in the manufacture of Right Cut might be deemed a flat bed sieve, having a reciprocating motion of perhaps four to five hundred per minute; that the dry material for Right Cut, being placed on the sieve, is more or less broken, and the particles fall through; that there are sixteen meshes to the inch; that he does not consider Copenhagen snuff; that all

tobacco is fermented more or less in the process of manufacture; that Right Cut is dried and flavored and cut, but not pulverized.

One John Dahner testified that he would class Copenhagen as fine cut tobacco; that it took from eleven to thirteen weeks to manufacture Copenhagen snuff; that Right Cut and Copenhagen are made from identically the same stock, and by the same process down to the cutting; that there is a difference in the cutting; that Copenhagen is cut twice, and cut coarser; that Right Cut is cut once, and cut in a finer cog; that Right Cut could not be cut any finer; that they could not make it any finer if they wanted to; that he knew of no machine that would cut it finer; that they cut Copenhagen coarser and then crosscut it; that Right Cut is first dried and then sifted; that the drying makes it very brittle; and in that condition it goes into the sieving machine, the opening of which is sixteen meshes to the inch; that you could put the head of a pin through it; that Right Cut is rubbed so as to break it up, and that all of the tobacco goes through excepting the stems; that it has to be broken up small enough to go through the mesh; never saw any other kind of tobacco submitted to the sieving process; that they did not grind either Right Cut or Copenhagen; that they manufacture a great many other varieties of snuff, all manufactured by a different process from Copenhagen and Right Cut.

E. N. Skinner testified that it took forty-eight hours from the time the product was taken from the hogshead until it was ready to pack into boxes for the consumer, to manufacture Right Cut tobacco; that Right Cut was not fermented in the course of manufacture, and that Copenhagen was; that granulated smoking tobacco was not dried as much as Right Cut before being sieved; that all the difference between Copenhagen and Right Cut was that Copenhagen has the coarse cut followed by a second cut, and it is fermented, whereas Right Cut has but one very fine cut, and is not fermented; that they are made from the same leaf and the same casing; that Copenhagen was not snuff; that he knew that snuff was chewed by a great many people, taken into the mouth and painting their teeth.

D. E. Rice testified that the uniformity and shortness of thread is much greater in Right Cut than in shorts; that he never had seen any chewing tobacco so uniformly fine and short shredded as Right Cut; that his company was still selling snuffs in North Dakota, in spite of

the law against them; that in his judgment Polish was the only snuff which came within the real definition of snuff; that he felt quite certain that his company had sold more Copenhagen snuff in North Dakota during the last year than ever before, and that Copenhagen was the only brand that they had extensively sold; that the reason his company had manufactured Right Cut was that they thought it would be taken as a chew, and all the pleasure of tobacco chewing experienced without mastication; that it required a good deal of mastication with most other chewing tobaccos.

There was also evidence that Bootjack was made of the same leaf as Right Cut; also of a copy of a booklet issued by the company, in which, though the manufacturers advertised Right Cut as chewing tobacco, they over and over again emphasized the fact that it did not require mastication; in fact, counsel for appellant in his brief states that he has no objections to the court's taking judicial notice of the fact that Copenhagen is chewed in a different manner than plug, but insists that the court should at the same time take judicial notice of the fact that the manner of chewing Copenhagen is not different from the manner of chewing the ordinary fine cut chewing, and Right Cut, and that the evidence so shows. With the exception of the evidence of Rice and Olson, however, we do not think that this is the fact.

*Engerud, Holt, & Frame,* for appellant.

The provisions of § 61 of the North Dakota Constitution are mandatory, and an act of the legislature is valid only to the extent that it is confined to the scope of its title. Divet v. Richland County, 8 N. D. 65, 76 N. W. 993; Richard v. Stark County, 8 N. D. 392, 79 N. W. 863; Folsom v. Kilbourne, 5 N. D. 405, 67 N. W. 291; Northwestern Mfg. Co. v. Chambers, 58 Mich. 381, 55 Am. Rep. 693, 25 N. W. 372; Fidelity Ins. Trust & S. D. Co. v. Shenandoah Valley R. Co. 86 Va. 1, 19 Am. St. Rep. 858, 9 S. E. 759; Lacey v. Palmer, 93 Va. 163, 31 L.R.A. 822, 57 Am. St. Rep. 795, 24 S. E. 930.

The use of the word "substitute" (for snuff) in the title to the act is too vague and indefinite for application or enforcement. It means no more than, "and so forth," and is not sufficiently and specifically *related* to the subject to render its meaning, and make its application, clear. Lacey v. Palmer, supra; State v. Arnold, 140 Ind. 628, 38 N. E.

820; Glenn v. Lynn, 89 Ala. 608, 7 So. 924; Fishkill v. Fishkill & B. Pl. Road Co. 22 Barb. 634; Ryerson v. Utley, 16 Mich. 269; St. Louis v. Tiefel, 42 Mo. 578; Johnston v. Spicer, 107 N. Y. 185, 13 N. E. 753; 26 Am. & Eng. Enc. Law, 2d ed. 656; Bishop, Statutory Crimes, §§ 3, 41; Hilburn v. St. Paul, M. & M. R. Co. 23 Mont. 241, 58 Pac. 551, 811; State ex rel. Wyatt v. Ashbrook, 154 Mo. 375, 48 L.R.A. 265, 77 Am. St. Rep. 765, 55 S. W. 627; State v. Excelsior Springs Light, Power, Heat & Water Co. 212 Mo. 101, 126 Am. St. Rep. 563, 110 S. W. 1079.

The statements of the witnesses as to what snuff is are in accord with the dictionaries and *word* authorities. Webster's Dict.; Century Dict.; Standard Dict.; 14 Enc. American; 26 Enc. Britannica, 11th ed. 1040; Werner, Tobacco, pp. 68, 69.

These various articles mentioned in the statute are made the same way, of the same substance, used for the same purpose, and with like effect. Therefore the exclusion of "Right Cut" is an unwarranted discrimination. Edmunds v. Herbrandson, 2 N. D. 271, 14 L.R.A. 725, 50 N. W. 970; State ex rel. Richards v. Hammer, 42 N. J. L. 439; Re Connolly, 17 N. D. 546, 117 N. W. 946; Plummer v. Borsheim, 8 N. D. 565, 80 N. W. 690; Vermont Loan & T. Co. v. Whithed, 2 N. D. 82, 49 N. W. 318; Gulf, C. & S. F. R. Co. v. Ellis, 165 U. S. 154, 41 L. ed. 667, 17 Sup. Ct. Rep. 255; Yick Wo v. Hopkins, 118 U. S. 356, 30 L. ed. 220, 6 Sup. Ct. Rep. 1064.

The act is unconstitutional as denying the equal protection of the law, and as class legislation. Connolly v. Union Sewer Pipe Co. 184 U. S. 556, 46 L. ed. 688, 22 Sup. Ct. Rep. 431; State v. Santee, 111 Iowa, 1, 53 L.R.A. 763, 82 Am. St. Rep. 489, 82 N. W. 445; Janesville v. Carpenter, 77 Wis. 288, 8 L.R.A. 808, 20 Am. St. Rep. 123, 46 N. W. 128; State v. Hinman, 65 N. H. 103, 23 Am. St. Rep. 22, 18 Atl. 194.

No arbitrary distinction between different kinds or classes of business can be sustained, the condition being otherwise similar. State ex rel. McCue v. Ramsay County, 48 Minn. 236, 31 Am. St. Rep. 651, 51 N. W. 112; Beleal v. Northern P. R. Co. 15 N. D. 318, 108 N. W. 33, 20 Am. Neg. Rep. 453; State ex rel. Mitchell v. Mayo, 15 N. D. 327, 108 N. W. 36; Re Connolly, 17 N. D. 546, 117 N. W. 946; State v. Mitchell, 97 Me. 66, 94 Am. St. Rep. 481, 53 Atl. 887; State v.

Cudahy Packing Co. 33 Mont. 179, 114 Am. St. Rep. 804, 82 Pac. 833, 8 Ann. Cas. 717; Chicago, M. & St. P. R. Co. v. Westby, 47 L.R.A. (N.S.) 97, 102 C. C. A. 65, 178 Fed. 619; Connolly v. Union Sewer Pipe Co. 184 U. S. 540, 46 L. ed. 679, 22 Sup. Ct. Rep. 431; Spraigue v. Thompson, 118 U. S. 90, 30 L. ed. 115, 6 Sup. Ct. Rep. 988; United States v. Reese, 92 U. S. 214, 23 L. ed. 563; Pollock v. Farmers' Loan & T. Co. 158 U. S. 601, 39 L. ed. 1108, 15 Sup. Ct. Rep. 912.

*J. P. Cain,* State's Attorney, *Andrew Miller,* Attorney General, and *Alfred Zuger* and *John Carmody,* Assistant Attorneys General, for the State.

The numerous pure food and health laws passed by the legislatures of other states have been universally sustained by the courts. Austin v. State, 101 Tenn. 563, 50 L.R.A. 478, 70 Am. St. Rep. 703, 48 S. W. 305, 179 U. S. 343, 45 L. ed. 224, 21 Sup. Ct. Rep. 132.

The prohibition law of this state against the sale of intoxicating liquors, *or "substitutes"* therefor, has been sustained. State v. Fargo Bottling Works, 19 N. D. 396, 26 L.R.A.(N.S.) 872, 124 N. W. 387; Pennell v. State, 141 Wis. 35, 123 N. W. 115; Sawyer v. Botti, 147 Iowa, 453, 27 L.R.A.(N.S.) 1007, 124 N. W. 787.

The act in question is no broader than is its title, and violates no provision of our Constitution. State ex rel. Kol v. North Dakota Children's Home Soc. 10 N. D. 493, 88 N. W. 273.

BRUCE, J. (after stating the facts as above). The first contention of appellant is that the information "does not show the commission of any offense in this, that the statute under which the information is drawn is void because it violates the section of the North Dakota Constitution, and also the provision of the 14th Amendment of the Federal Constitution, inhibiting unequal legislation by the state in this, that it arbitrarily excludes from the markets of this state, and prohibits the importation, manufacture, sale, and use of, tobacco in some forms, and permits it in others, there being no reasonable grounds for the discrimination between the forms prohibited and those permitted." It is claimed that police regulations must reach and affect equally all persons and objects in the class to which they apply, and that there is no sound basis for a classification in which snuff is placed separate and

apart from tobacco in other forms. It is argued, and the evidence no doubt tends to show, that the effect of snuff is communicated to the system through the mucous membranes, and that the same is true of chewing tobaccos generally, and of those excluded from the provisions of the act. It is also claimed, and the evidence no doubt tends to show, that fermentation tends to destroy the nicotine, and that snuff which has been thoroughly fermented contains less of that commodity than ordinary tobacco, and that on this account it is less harmful.

There is a wide difference in the attitude of the courts toward statutes which restrict that which is harmful and those which restrict that which is harmless. The courts can certainly take judicial notice that the use of tobacco in any form is uncleanly, and that its excessive use is injurious. They can take judicial notice of the fact that its use by the young is especially so. Tobacco, in short, is under the ban. We realize, of course, that the Supreme Court of the United States refused in the case of Austin v. Tennessee, 179 U. S. 343, 45 L. ed. 224, 21 Sup. Ct. Rep. 132, to hold that tobacco was so much a nuisance as not to be a legitimate subject of interstate commerce. In the case, however, if fully upheld, the supreme court of Tennessee, in holding that it was within the power of the state to absolutely prohibit the sale of cigarettes within its borders when once the original package had been broken, even though the Supreme Court of the nation itself refused to take judicial notice that tobacco in the form of cigarettes was more noxious than in any other form. "Cigarettes," the court said, "do not seem until recently to have attracted the attention of the public as more injurious than other forms of tobacco; nor are we now prepared to take judicial notice of any special injury resulting from their use, or to indorse the opinion of the supreme court of Tennessee, 'that they are inherently bad and bad only.' At the same time we should be shutting our eyes to what is constantly passing before them were we to affect an ignorance of the fact that a belief in their deleterious effects, particularly upon young people, has become very general, and that communications are constantly finding their way into the public press denouncing their use as fraught with great danger to the youth of both sexes. Without undertaking to affirm or deny their evil effects, we think it within the province of the legislature to say how far they may be sold, or to prohibit their sale entirely after they have been taken from the original packages, or have

left the hands of the importer, provided no discrimination be used as against such as are imported from other states, and there be no reason to doubt that the act in question is designed for the protection of the public health. . . . There is doubtless fair ground for dispute as to whether the use of cigarettes is not hurtful to the community, and therefore it would be competent for a state, with reference to its own people, to declare, under penalties, that cigarettes should not be manufactured within its limits. No one could say that such legislation trenched upon the liberty of the citizen by preventing him from pursuing a lawful business." We do not believe that we have to inquire strictly into the motives or reasons which actuated the legislature. We can only set aside a statute of this kind if we cannot possibly see any reasonable necessity for its enactment; that is to say, no possible and reasonable reference to the public health or morality or to the real public good. Is not the very fact that snuff is generally used by holding it between the lip and the gum without mastication, or by plastering it upon the gums, a valid reason for the legislature condemning it, while leaving ordinary chewing tobacco alone? We believe that we can take judicial notice of the fact that many contend that the use of snuff between the lip and the gum has a tendency to paralyze the nerves of that portion of the face. We certainly can take cognizance of the fact that the schoolboy can secretly use tobacco in the form of snuff, when he would be liable to be detected in any other form of use. One who chews or masticates tobacco can be easily detected in the process. One of the strongest arguments, indeed, in favor of the crusade against the cigarette, is that cigarettes are easily and cheaply obtained, and that the boy is liable to be tempted by that fact, and that the use of tobacco will thus be increased. The same argument is certainly applicable in the case of snuff which is used, not in the nose, but upon the gums or between the lip and the gum. So, too, we cannot be blind to the general fear that drugs and opium are, and that drugs and opium certainly can be, easily mingled with snuff, and perhaps less readily detected than in other forms of tobacco.

Nor does the fact that the legislature made an exception in favor of "that ordinary plug, fine cut, or long cut chewing tobacco, as now commonly known to the trade of this state," render the statute unconstitutional. The modern trend of authority is certainly in favor

of the proposition that police laws need not necessarily be omnibus in their character, and that it is permissible to legislate against one form of evil even though many other and similar evils have not been condemned. "It may often happen," says the Supreme Court of the United States in Cotting v. Kansas City Stock Yards Co. (Cotting v. Godard) 183 U. S. 111, 46 L. ed. 109, 22 Sup. Ct. Rep. 43, "that some classes are subjected to regulations, and some individuals are burdened with obligations, which do not rest upon other classes or other individuals not similarly situated. License taxes are imposed upon certain classes of business while others are exempt. It would practically defeat legislation if it was laid down as a rule that a statute was necessarily adjudged invalid if it did not bring all within its scope, or subject all to the same burdens. It would strip the legislature of its inherent power to determine generally what is for the general interests, which interests may often be promoted by certain regulations affecting one class which do not affect another, certain burdens imposed on one which do not rest upon another." A beginning must be made somewhere. It is not necessary that we should condemn all vice in order that any reformation shall be made. Would anyone say that a statute would be void for class legislation which should prohibit the use of whisky, but at the same time contain no prohibition against the use of beer? No criminal should be allowed to complain or to escape punishment because someone else is more of a criminal or more dangerous to society than he; nor should any product which is injurious to the community escape regulation and condemnation because there are others equally injurious which are not at the same time regulated or forbidden. There is, in fact, no vested right or interest in that which is a nuisance, or the use of which is injurious to the public weal. Missouri, K. & T. R. Co. v. Haber, 169 U. S. 613, 42 L. ed 878, 18 Sup. Ct. Rep. 488; Mugler v. Kansas, 123 U. S. 623, 31 L. ed. 205, 8 Sup. Ct. Rep. 273; Kidd v. Pearson, 128 U. S. 1, 32 L. ed. 346, 2 Inters. Com. Rep. 232, 9 Sup. Ct. Rep. 6; 23 Cyc. 77. So, too, is it not perfectly reasonable for the legislature to say that in its opinion it is better to make a beginning and to enact a law which can be uniformly enforced, rather than a more sweeping one which could not be; for it to say, in short, that it will begin with snuff, and then later on, if it chooses, extend the condemnation throughout the whole range of

26 N. D.—21.

tobacco? It can and has done this in the case of cigarettes. See State v. Austin, 101 Tenn. 563, 50 L.R.A. 478, 70 Am. St. Rep. 703, 48 S. W. 305; Austin v. Tennessee, 179 U. S. 343, 45 L. ed. 224, 21 Sup. Ct. Rep. 132. Why can it not do it in the case of snuff? It is true that "ordinary plug, fine cut, or long cut chewing tobacco, as now commonly known to the trade of this state," has many characteristics in common with snuff and with Right Cut. It may, however, also be that the legislature may have said that they knew these products and could watch them, but that they did not desire the entry of any more similar products into the state which would add to the common vice or require further supervision, especially a product which, on account of its fineness, could be more easily drugged and more easily concealed, and whose intended use was absorption, and not mastication.

We do not think that there is any merit in the contention that the title of the act refers merely to snuff, and that Right Cut is, at the most, merely a substitute for snuff; that the contention of the appellant is largely that it is a substitute for Copenhagen, and that even Copenhagen is not snuff. The brief of counsel for appellant contains a long and extremely interesting history of snuff and of its manufacture, and from this we may deduce the fact that for a long time, in order that an article might be deemed snuff, it was necessary that it should have been powdered or pulverized and fermented, and intended to be taken in the nose. We have before us, however, a definition of snuff in the statute, and though the word "snuff" alone is used in the title, and not snuff "as defined by this statute," we believe that any court, in construing the meaning of words in a statute, should give to those words the meaning that is given to them in its own jurisdiction, even though their meaning in the world at large may be different. The Englishman, for instance, would never give to the word "tugs" the meaning that we give, but would call them "traces." When we speak of "lines" in connection with harness, we use the word in the place of the English word "reins." The words, it is true, are now to be found in the dictionaries, but they did not appear in the dictionaries in the sense in which we use them until quite recently. Dictionaries do not give to words their meaning. The meaning of most of our words were given by usage long before dictionaries were ever heard of. All that the dictionary does is to chronicle that which has been done. They are added

to and different meanings are given to the same word as the word comes to be used in a different sense. This is true even of the word "snuff." Webster and Worcester, it is true, speak only of its use in the nose, but the Standard Dictionary also speaks of the use upon the gums. Though, too, counsel for appellant also insists upon the prerequisite of fermentation, no mention is made of this element in Worcester's, Webster's, or the Century Dictionaries, but in the Standard alone. There even only "slight fermentation" is spoken of. We realize, of course, that the Encyclopedia Americana, the Encyclopedia Britannica, and Werner's Text-Book in Tobacco speak of this fermentation, but what we seek to emphasize is that the dictionaries and encyclopedias do not create words or processes or give to them their meaning. They chronicle merely, and must of necessity be constantly corrected and added to. The use, however, must precede the chronicling. In North Dakota the word "snuff" has a well-established meaning in the popular mind, and is used in the sense of the definition that is given in the statute. The manufacturers of the tobacco in the case at bar must have been aware of the fact, for it is a matter not merely of proof in the record before us, but of common notoriety, that for many years they put upon the market a product called "Copenhagen" and labeled it "snuff," though it was intended to be used, and the overwhelming majority of its users used it, upon the gums and between the lips and the gums, and not in the nose. We hold, therefore, and we believe, that there is enough of state sovereignty still left in America for us to hold that no matter how the word "snuff" may be limited in its meaning in other jurisdictions, in North Dakota it embraces tobacco which is intended to be used upon the gums as well as tobacco that is intended to be used in the nose.

Nor is there any merit in the contention that Right Cut is a substitute for snuff or Copenhagen, and that the title of the act only uses the word "snuff." We believe that it is just as much a snuff as is Copenhagen; but even if it were a substitute, that the title of the act is broad enough to include it. A title which evinces the intention to prohibit the sale of an article is, we believe, broad enough to prohibit the sale of a substitute for that article, when that substitute is open to the same objection as the principal article itself. Section 2 does nothing more than to exclude from its provisions *chewing* tobacco as

commonly known to the trade. We are quite satisfied that Right Cut was not chewing tobacco, but snuff.

In answer to the proposition that "if the act be construed without reference to its title, and it should be accordingly held that it is operative to all tobaccos except those named in the provisions, then it is unconstitutional in its entirety, and the whole act must fail," we hold, in short, that the title of the act should be used in the construction thereof, not as adding to the act, but as a means of determining the legislative intent, and that the act is an anti-snuff act. We hold that as the term is used in North Dakota, both Copenhagen and Right Cut are snuffs, while the tobaccos excepted from the provisions of the act are not. Some of them, it is true, come close to the line, but that line is and must be drawn largely upon the basis of fineness and dryness, and it·must be drawn somewhere. It is undisputed that both Right Cut and Copenhagen are drier and finer than the tobaccos excepted. It is also undisputed, and the evidence tends to show, that they were both intended to be used in the same way, that is to say, upon the gums and between the lip and the gums, and that such use is not the ordinary, and we might say necessary, use of even the finest of the other tobaccos mentioned. We can take judicial notice of the fact that it was the use upon the gums and between the lip and the gums that was condemned by popular sentiment in North Dakota. We are not prepared to say, therefore, that the legislature drew the line at the wrong place; neither can we agree with counsel for appellant in his statement that "if Right Cut be construed as being under the ban of the act, that the court by such a construction would in effect make the proviso read thus: 'Provided, however, that Right Cut chewing tobacco, manufactured by Weyman-Bruton Company, shall be included in this definition, but ordinary plug, fine cuts, and long cuts shall not be so included.'" This court knows nothing of the firm of Weyman-Bruton Company, nor did the legislature. It does know, however, of the pernicious effects of the use of snuff. What we hold is not that all other fine cuts shall be excluded, but only those fine cuts which are not cut so fine or otherwise manufactured so that their natural use is upon the gums and between the lip and the gums, and which use involves not mastication, but absorption. When any manufactured tobacco comes physically and chemically within the class of Copenhagen or Right

Cut, it is condemned by the statute, no matter by whom manufactured. We hold, in short, that fine cut "chewing" tobacco is generally excluded, but that fine cut "snuff" is not. Counsel does not quote the language of the exception correctly in his illustration. It is "ordinary plug, fine cut, or long cut *chewing* tobacco," and not "ordinary plug, fine cuts, and long cuts." In the statute the words "snuff" and "chewing tobacco" are both used and antithesised. They must have been intended to have had different meanings.

We are quite satisfied that the evidence in the case at bar justifies the conclusion at which we have arrived. When passing upon the validity of the statute as a whole, however, and in seeking to determine what does or does not come within the meaning of the word "snuff," and in considering the necessity of prohibiting the sale of tobacco which is finely cut or ground and dried in order that the same may be taken into the mouth and absorbed, even if not into the nose, or its adaptation to either or both uses, we are not necessarily confined to the evidence in the case, or to the verdict of the jury thereon. The courts can and should take judicial notice of those facts which may be judicially noticed, that is, facts of common notoriety and knowledge, and above all they should recognize the prerogatives of the legislature as well as their own. "The constitutional right to use property without regulation is plain," says the supreme court of Michigan in People v. Smith, 108 Mich. 527, 532, 32 L.R.A. 853, 62 Am. St. Rep. 715, 66 N. W. 382, "unless the public welfare requires its regulation. If the public welfare does require it, the right must yield to the public exigency. And it is upon this question of necessity that the third question depends. All, then, seems to be embraced in the question of necessity. Unless the emery wheel is dangerous to health, there is no necessity, and consequently no power, to regulate it. Unless the blower is a reasonable and proper regulation, it is not a necessary one. Who shall decide the question, and by what rule? Shall it be the legislature or the courts? And if the latter, is it to be determined by the evidence in the case that happens to be first brought, or by some other rule? Does it become a question of fact to be submitted to the jury or decided by the court? Of all the devices known to human tribunals, the jury stands pre-eminent in its ability to determine cases in direct violation of and contrary to law, without impairing the bind-

ing force of the law as a rule of future action. We have known of instances where the question of the constitutionality of acts, as applied to the particular case on trial, has been made to depend upon the finding of the jury upon the facts in the case. But there is a manifest absurdity in allowing any tribunal, either court or jury, to determine from testimony in the case the question of the constitutionality of the law. Whether this law invades the rights of all the persons using emery wheels in the state is a serious question. If it is a necessary regulation, the law should be sustained, but if an unjust law, it should be annulled. The first case presented might show by the opinions of many witnesses that the use of the dry emery wheel is almost necessarily fatal to the operative, while the next might show exactly the opposite state of facts. Manifestly, then, the decision could not settle the question for other parties, or the fate of the law would depend upon the character of the case first presented to the court of last resort, which would have no means of ascertaining whether it was a collusive case or not, or whether the weight of evidence was in accord with the truth. It would seem, then, that the questions of danger and reasonableness must be determined in another way. The legislature, in determining upon the passage of the law, may make investigations which the courts cannot. As a rule, the members (collectively) may be expected to acquire more technical and experimental knowledge of such matters than any court can be supposed to possess, both as to the dangers to be guarded against and the means of prevention of injury to be applied; and hence, while under our institutions the validity of laws must be finally passed upon by the courts, all presumptions should be in favor of the validity of legislative action. If the courts find the plain provisions of the Constitution violated, or if it can be said that the act is not within the rule of necessity in view of facts of which judicial notice may be taken, then the act must fall; otherwise it should stand. Applying this test, we think the law constitutional, and the judgment is therefore affirmed." See also Wenham v. State, 65 Neb. 394, 58 L.R.A. 825, 91 N. W. 421.

So, too, conceding, as we must concede, that the use of tobacco in any form is to a greater or less degree harmful, can this court interpose its judgment and discretion and theory on an ultimate question of fact and public policy against that of the legislative body, which comes di-

rectly from the people, is in close touch with industry and the ordinary activities of life, and has the opportunity of a thorough investigation by means of committees and research? See Wenham v. State, supra. The testimony produced upon the trial shows conclusively that the percentage of moisture in Right Cut and in what is called Copenhagen snuff is almost the same, in fact, that there is about 7 per cent less moisture in Right Cut than in Copenhagen, and that the amount of nicotine is about the same. It is shown also that the moisture in ordinary tobacco is much greater and that the nicotine is less. The argument is made by counsel for appellant that snuff, if properly prepared, is fermented, and that the fermentation destroys much of the nicotine. It is argued that there was no process of fermentation to any extent used in relation to the Right Cut, and a two-horned argument is made that in the first place neither Copenhagen nor Right Cut are snuff, as they are not intended to be used in the nose, and in the second place that fermentation to a greater or less extent neutralizes the injurious effect · of the nicotine. The real fact of the case is that whether Copenhagen is snuff or not in the technical sense of the word, it has been labeled as snuff by its manufacturers for many years, and is universally spoken of as such throughout the Northwest. Both Copenhagen and Right Cut are fully covered by the definition of snuff in the statute, being "intended to be taken by the *mouth* or nose." As compared with other forms of tobacco, they contain but little moisture. They are the finest cut or ground of all of the brands of tobacco covered by the statute and in use in North Dakota. They are capable of being used in the nose, being cut fine and being dried. Their natural and ordinary and intended use is that they shall be used in the mouth, but not masticated. Tobacco made in, and intended to be used in, such form is, both under the definition of the statute and in universal acceptation in the Northwest, snuff. The manufacturers, in short, have through many years called such tobacco snuff, and now solemnly come before us and tell us that through such years they have been defrauding and misleading the people.

Nor can we say that the legislature created a purely fictitious classification in distinguishing forms of tobacco such as Copenhagen and Right Cut from "that ordinary plug, fine cut, or long cut chewing tobacco as now commonly known to the trade of this state." It is ad-

mitted by all parties that Right Cut and Copenhagen were and are the finest cut of all the tobaccos and the driest; that as such they were not intended to be chewed as the term is ordinarily used. They were to be retained in the mouth merely, and gradually absorbed, and were not intended to be masticated. Aside from the question of secrecy and the possibility of stimulating a wide-spread habit among minors which would be difficult of detection by their parents, there is much in the evidence to show, and the legislature may reasonably have inferred, that such use of tobacco and such forms of tobacco were more injurious than those connected with the kinds excluded from the operation of the act. There is evidence, in short, and common experience reinforces the evidence, that he who masticates tobacco expectorates a large portion of it, and that his expectoration is freest when the nicotine is the strongest; in other words, that he expectorates the most freely when the tobacco is moist and is first placed in his mouth, and that when he has drawn from it the nicotine and the residue is a mere pulp, he expectorates but little. In such a process, therefore, much of the nicotine is expelled. In the case of the use of snuff, however, under the lip or smeared upon the gums, there is little or no expectoration, and practically all of the nicotine ultimately enters the system. It is argued, of course, that saliva is necessary for digestion, and that a habit is injurious which causes much expectoration. It is therefore argued that chewing tobacco is more injurious than the use as snuff. The argument, however, works both ways, and is not conclusive. It is admitted that a flow of saliva is necessary to digestion, and that such does not arise without mastication. Even, therefore, if it be true that in chewing saliva is expelled, it is also true that it is mingled with the tobacco that is swallowed and in a measure neutralizes it. In the case of snuff, however, where there is little or no mastication, and therefore little or no saliva, the tobacco is absorbed without being neutralized by the saliva. The proof, as we have before shown, also tends to show that the nicotine absorbed is greater in the case of snuff than in that of chewing tobacco. At any rate, all of these matters were for the legislature to pass upon. There were two methods of using tobacco before them. They evidently seemed to think that one was more injurious to the general public than the other. We are not prepared to oppose our judgment to theirs, nor are we prepared to say that the classification made is not a reasonable one.

Austin v. State, 101 Tenn. 563, 50 L.R.A. 478, 70 Am. St. Rep. 703, 48 S. W. 305; Austin v. Tennessee, 179 U. S. 343, 45 L. ed. 224, 21 Sup. Ct. Rep. 132; Wenham v. State, 65 Neb. 394, 58 L.R.A. 825, 91 N. W. 421; Powell v. Pennsylvania, 127 U. S. 678, 32 L. ed. 253, 8 Sup. Ct. Rep. 992, 1257; Gundling v. Chicago, 177 U. S. 183, 44 L. ed. 725, 20 Sup. Ct. Rep. 633, 176 Ill. 340, 48 L.R.A. 230, 52 N. E. 44; Holden v. Hardy, 169 U. S. 366, 42 L. ed. 780, 18 Sup. Ct. Rep. 383; 60 Cent. L. J. 428; People v. Lochner, 73 App. Div. 120, 76 N. Y. Supp. 396, 177 N. Y. 145, 101 Am. St. Rep. 773, 69 N. E. 373; People v. Bellet, 99 Mich. 151, 22 L.R.A. 696, 41 Am. St. Rep. 589, 57 N. W. 1009; People v. Smith, 108 Mich. 527, 32 L.R.A. 853, 62 Am. St. Rep. 715, 66 N. W. 382; State v. Nichols, 28 Wash. 628, 69 Pac. 372; People v. Havnor, 149 N. Y. 195, 31 L.R.A. 689, 52 Am. St. Rep. 707, 43 N. E. 541; Ex parte Northrup, 41 Or. 489, 69 Pac. 445.

The judgment of the District Court is affirmed.