Message Photoplay Co., Plaintiff, *v.* George H. Bell, as Commissioner of Licenses of the City of New York, Defendant.*

(Supreme Court, New York Special Term, June, 1917.)

Injunctions — motion for, granted — theatres — city of New York — licenses.

> The production at a theatre of the moving picture known as "Birth Control" is a measured and decent exercise of the right of free speech guaranteed by our Constitutions, essential to our national well being and as such is beyond the power of the commissioner of licenses of the city of New York to forbid, and a motion for an injunction to restrain him from revoking the license of a theatre because of the proposed production thereat of said moving picture will be granted.

Motion for a temporary injunction.

* See page 281, *post.*— [Repr.

Supreme Court, June, 1917.          [Vol. 100.

Goldstein & Goldstein (Jonah J. Goldstein, of counsel), for plaintiff.

Lamar Hardy, corporation counsel (George P. Nicholson, of counsel), for defendant.

BIJUR, J.   This is a motion for a temporary injunction to restrain the commissioner of licenses from revoking the license of a theatre because of the proposed production thereat of a moving picture known as " Birth Control." No question is raised concerning the general power of the commissioner to issue and revoke licenses. Greater N. Y. Charter, §§ 641, 642, added by Laws of 1914, chap. 475. For the purposes of this motion also, the implied definition of the function of the commissioner, contained in chapter 3, article 2, section 41, of the Code of Ordinances of the City of New York, as amended to July 16, 1916, may be accepted. That section reads as follows: " The inspectors of the department of licenses * * * shall report to the commissioner any offense *against morality, decency or public welfare * * *.*" It is conceded by the plaintiff that the discretion of the commissioner, exercised in a proper case, may not be interfered with by the courts merely because the latter may not agree with the commissioner's reasoning or judgment. It is not claimed on behalf of the commissioner, however, that the discretion conferred upon him may be exercised without any reasonable basis of fact, or, as it is frequently phrased, " arbitrarily exercised." Such exercise would be subject to review and correction by the courts in an appropriate proceeding. *People ex rel. Lieberman* v. *Vandecarr,* 199 U. S. 552, 562; *People ex rel. Schwab* v. *Grant,* 126 N. Y. 473, 482; *People ex rel. Lodes* v. *Dept. of Health,* 189 id. 187, 194; *Ormsby* v. *Bell,* 171 App. Div. 657.

The question is, therefore, whether there is any valid or reasonable basis for the commissioner's opinion that the play is " against morality, decency or public welfare." Plaintiff admits that the commissioner is acting in good faith.

On the other hand, I think I may say that it is conceded on behalf of the commissioner that there is nothing indecent or obscene in any of the pictures in the sense in which those words are usually understood, that is to say, they contain nothing which might ordinarily be regarded as prurient or directly " suggestive." The scenario of the play may be briefly summarized as follows: It presents a number of pictures showing the poverty and misery frequently associated with the presence of large families of children among the poor. It illustrates the sufferings of one or more women to whom childbirth means serious danger to life. It then presents pictures of comfort among the rich where smaller families are supposed to obtain. Intermingled with these are pictures of Mrs. Sanger acting as a nurse. She is strongly tempted to advise some of the suffering poor women on the subject of birth control, but refrains from giving such information because it is forbidden by law. Penal Law, § 1142. Finally, she concludes to defy the law and opens a clinic to disseminate information on this subject. There is then portrayed a movement undertaken by persons of means who engage detectives to suppress her efforts. The clinic established by Mrs. Sanger is exhibited crowded by poor women. Thereupon the police, instigated by the association referred to,-place Mrs. Sanger under arrest, and she is finally shown in prison after conviction for violating the law. No suggestion or hint of the methods or means looking to a violation of the law or for facilitating birth control is anywhere contained in the pro-

posed exhibition. It may perhaps be inferred from the pictures that the rich violate the law by employing contraceptive methods of which the poor are ignorant; that there is a certain amount of hypocrisy on the part of those who lend their active support to the enforcement of this law, and that Mrs. Sanger is actuated by high and unselfish motives in condemning and even in violating it. This inference is illustrated by touches which I presume are intended to lend to the performance greater dramatic color.

The objections to the exhibition as presented on behalf of the commissioner may, I think, fairly be summed up as follows: *First*, that it deals with a subject which is in itself immorally suggestive; *second*, that it advertises the existence of contraceptive methods or means, and substantially announces that Mrs. Sanger is familiar therewith; *third*, a subject of this kind is not fit for treatment in a public moving picture theatre; *fourth*, that the performance encourages violation of the law. Taking up the last objection first, I can find no sound basis for it. The result of the exhibition is to show Mrs. Sanger punished for a violation of the law. There is no encouragement for others to follow the same course, nor is it even hinted that violence or defiance of the law should be indulged in to nullify its provisions or for the relief of those who may have suffered its penalties. It has been suggested that it is unmoral to present Mrs. Sanger, a violator of the law, as a " heroine;" but the use of this catch phrase, borrowed from the language of the " border drama," must not divert us from a just appraisal of the performance. It cannot be fairly said that she is presented in the play as a martyr, though that might be permissible. If any one with a saving sense of humor had proposed to call the play " The Way of the Transgressor Is Hard," the title would

have been perhaps more truly descriptive. Broadly considered, the criticism that this performance encourages violation of the law might be addressed with equal force to an exhibition of the exploits of John Brown or a narrative of the career of William Lloyd Garrison. As to the argument that the exhibition advertises either the subject of birth control or Mrs. Sanger's activities — while of course it is true that any form of publicity must necessarily have that effect — it does not seem to me to be possible in a judicial sense to distinguish the publicity here afforded from that contained in the very law itself. Moreover, apart from other and fundamental considerations to which I presently shall advert, the subject and Mrs. Sanger's connection therewith have been so voluminously and recently exploited without restriction in the daily press that this or similar exhibitions are but an afterglow compared with the glaring light of publicity which has thus previously been thrown upon them.

The objection that the matter is not of a character fit for treatment at a public moving picture exhibition seems to me to lie rather to the good taste of the promoters of the picture than to any legal impropriety in the play itself. The subject is plainly one in which the public has an interest, and concerning which two conscientious and opposite views are and may properly be held. As, therefore, the public welfare may be affected by the dominance of the one or the other view, it is both appropriate and lawful that the matter be publicly considered, provided the presentation be free from gratuitous or obtrusive uncleanliness. In that respect I am unable to distinguish substantially the presentation in this proposed exhibition from one in words at public meetings. It may also be argued with much plausibility that a discussion or presentation of a subject of this kind should be limited to persons

engaged in certain professions or of a certain age, although the precise line of demarcation would be rather difficult to draw. Any extended consideration of this branch of the question is rendered fairly academic by the proposal of plaintiff to limit admission to the performance to adults only. Viewed as other than an ordinary dramatic entertainment, the exhibition is merely a pictured argument against an existing law. As such, it deals with an undoubtedly great problem of life, in which our citizenship as a whole has the right to take an active interest. It is possible that a certain and perhaps not altogether prudish sense of delicacy may be offended, or a natural disinclination to consider frankly an unpleasant subject may be shocked into activity by this exhibition; but that does not warrant the suppression of a prosaic public performance. It is true that unclean minds may find unclean suggestion in the discussion of any subject which involves the relations of the sexes. The same possibility exists even in necessary everyday conversations on such matters. It lies dormant in hundreds of the classics of literature and art; in pictures, books, operas and plays open to every one, even in Holy Writ.

The welfare of the community, however, cannot be limited by a standard based upon the possible misconceptions of persons with perverted tastes. It may not be inept to recall the passage from Mill on Liberty, in the course of which, while discussing freedom of speech, he cites the case of Socrates, who was convicted of " immorality " as a " corrupter of youth." The pictures suggest nothing erotic or obscene; neither the subject of birth control nor the course of its advocates or opponents is presented in " high colors " nor with undue exaggeration, but rather in a measured and dispassionate tone. I think that a valuable analogy

and guide as to the law applicable to this case is to be found in the many decisions which deal with the extent of the police power of the state; such for example, as *Lochner* v. *New York*, 198 U. S. 45, revg. *People* v. *Lochner*, 177 N. Y. 145, and also *Matter of Jacobs*, 98 N. Y. 98, 114. In the prevailing opinion in the *Lochner* case, in the Federal Supreme Court, at page 56, occurs the significant phrase: " It must, of course, be conceded that there is a limit to the valid exercise of the police power by the State. * * * Otherwise * * * The claim of the police power would be a mere pretext — become another and delusive name for the supreme sovereignty of the State to be exercised free from constitutional restraint." And the question is thus there posed: " Is this a fair, reasonable and appropriate exercise of the police power of the State, or is it an unreasonable, unnecessary and arbitrary interference with the right of the individual to his personal liberty? * * * " From this standpoint, it seems to me that there is nothing in the exhibition proposed to be given which warrants or calls for the exercise for any censure or censorship on the part of the commissioner, and that the performance is beyond his power to interdict. Viewed from another angle, however, my conclusion appears to be strongly fortified. It is needless to speak of the importance of freedom of speech in a republic like ours.

The value of that institution in a democratic government has been accentuated by the result of our political experiment in which public opinion has become perhaps the dominant factor. So keen an observer as Lord Bryce has devoted an entire part of his classic, " The American Commonwealth," to a consideration of the value and influence of public opinion in our government. In discussing two dangers to which a government thus influenced may be exposed, he says: " One

18

— the smaller one — yet sometimes troublesome, is the difficulty of ascertaining the will of the majority. * * * *The other danger is that minorities may not sufficiently assert themselves.* Where a majority has erred, the only remedy against the prolongation or repetition of its error is in the continued protests and agitation of the minority, an agitation which ought to be peaceably conducted, carried on by voice and pen, but which must be vehement enough to rouse the people and deliver them from the consequences of their blunders." Under the same head, again, he cites the strength of popular government (after comparing it to a pyramid — the very emblem of stability), and adds: " It has no need to fear discussion and agitation." Assured freedom of speech insures resort to discussion as to the sole necessary means to reform. The solvency of American institutions is based largely upon the flexibility of the popular life and of the institutions under which it exists. The abiding conviction on the part of every citizen that he may freely express his opinion and advocate any peaceable means of reform is in itself the greatest preventive of the use of force or of temptation to violent and subversive change. Indeed, it is probably the decisive factor in reconciling us (as Lord Bryce intimates) to willing submission to the iron discipline of war, and to according to our administrative officers in times of crisis an almost absolute power. We know that when the need has passed the people may safely and freely demand the recall of that power to its proper source. De Tocqueville, in his " Democracy in America " (Pt. III, chap. 21), says: "*Although* the Americans continually modify or abrogate some of their laws, they are far from evidencing revolutionary passions." This observation is accurate, but not complete.

To my mind the learned author has overlooked the

fact that in the very statement of the phenomenon he was including its cause. Had he said: "*Because* the Americans continually modify their laws they are far from showing revolutionary passions," he would have apprehended one of the truths which accounts for the evenness of our national existence. Comparatively paradoxical as it may appear, the soundness and the serenity of our communal life rest upon the absence of rigidity in our system of law and upon the opportunity for the facile change of such of our institutions as are not absolutely fundamental. Compared with the importance of guarding the commonwealth against even the possibility of disturbing the foundation of our social solidity by unduly limiting the vital right of free speech, the contention that the exhibition here complained of might be construed as immoral, seems to me to be neglible. I think that the performance which the commissioner of licenses has sought to interdict may not properly be interpreted as more than an attempt to present a dramatic argument in favor of the change of an existing law; that while its form, its force and its good taste may furnish ground for an honest difference of opinion, there is nothing in it which can reasonably be viewed as "against morality, decency or public welfare." It affords, therefore, no basis for the exercise of any discretion on the part of the commissioner. It is a measured and decent exercise of the right of free speech, guaranteed by our constitutions, essential to our national well-being, and, as such, beyond the power of the commissioner of licenses to forbid.

Motion granted.